[Cite as *State v. Barnette*, 2013-Ohio-990.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

BUTLER COUNTY


| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Plaintiff-Appellee, | : | CASE NO.  CA2012-05-099 |
| | : | O P I N I O N |
| - vs - | | 3/18/2013 |
| | : | |
| STEPHAN R. BARNETTE, | : | |
| Defendant-Appellant. | : | |


CRIMINAL APPEAL FROM BUTLER COUNTY COURT OF COMMON PLEAS
Case No. CR2012-02-0146


Michael T. Gmoser, Butler County Prosecuting Attorney, Michael A. Oster, Jr., Government Services Center, 315 High Street, 11th Floor, Hamilton, Ohio 45011, for plaintiff-appellee

John T. Willard, P.O. Box 35, Hamilton, Ohio 45012, for defendant-appellant


**HENDRICKSON, P.J.**

{¶ 1}  Defendant-appellant, Stephan Barnette, appeals his conviction in the Butler County Court of Common Pleas for murder with a gun specification.  For the reasons set forth below, we affirm the conviction.

{¶ 2}  On the evening of October 6, 2011, appellant, Jordan Hardy, and Robert Reece traveled by vehicle to Fairview Avenue in Hamilton, Butler County, Ohio for the purposes of collecting drug money owed to appellant by Rickey L. Butler (the "victim").  Appellant and

Reece entered the victim's Fairview Avenue apartment (the "Fairview Residence") and spoke with the victim for a time. Hardy waited in the car. At some point during the discussion, the victim allegedly pulled out a knife. An altercation occurred concluding in appellant firing numerous shots from a 9 mm handgun, striking the victim five times. Appellant and Reece then exited the Fairview Residence, entered the vehicle driven by Hardy, and fled the scene. The gun was sold the same night and later disposed of by the purchaser.

{¶ 3} On February 8, 2012, appellant was indicted for the murder of the victim in violation of R.C. 2903.02(A) and a gun specification pursuant to R.C. 2941.14. At a trial by jury, appellant claimed self-defense. The jury ultimately found appellant guilty of murder while in possession of a firearm. Appellant was sentenced to 15 years to life for the murder conviction and received an additional three-year sentence for the gun specification, to run consecutively. Appellant now appeals, raising five assignments of error.

{¶ 4} Assignment of Error No. 1:

{¶ 5} THE JUDGMENT AND CONVICTION IN THE INSTANT CASE WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AND THE JURY CLEARLY LOST ITS WAY IN REACHING A VERDICT OF GUILTY.

{¶ 6} In his first assignment of error, appellant contends that his conviction was against the manifest weight of the evidence when all eye-witness testimony indicated that the victim attacked appellant with a knife and appellant only shot the victim in self-defense.

{¶ 7} A "manifest weight challenge concerns the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other." *State v. Wilson*, 12th Dist. No. CA2006-01-007, 2007-Ohio-2298, ¶ 34. In determining whether the conviction is against the manifest weight of the evidence, an appellate court "must weigh the evidence and all reasonable inferences from it, consider the credibility of the witnesses and determine whether in resolving conflicts, the jury clearly lost its way and

created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Coldiron,* 12th Dist. Nos. CA2003-09-078, CA2003-09-079, 2004-Ohio-5651, ¶ 24; *State v. Thompkins*, 78 Ohio St.3d 380, 387, 1997-Ohio-52. "This discretionary power should be exercised only in the exceptional case where the evidence weighs heavily against conviction." *Id.* An appellate court will not reverse a judgment as against the manifest weight of the evidence in a jury trial unless it unanimously disagrees with the jury's resolution. *State v. Bailey*, 12th Dist. No. CA2002-03-057, 2003-Ohio-5280, ¶ 22.

{¶ 8} Appellant was charged with murder in violation of R.C. 2903.02(A), which provides that "[n]o person shall purposely cause the death of another * * *." While it is undisputed that appellant shot and killed the victim, appellant contends that the jury lost its way and created a manifest miscarriage of justice in not finding that appellant's actions were done in self-defense.

{¶ 9} "Under Ohio law, self-defense is an affirmative defense a defendant must prove by a preponderance of the evidence." *State v. Tucker*, 12th Dist. No. CA2010-10-263, 2012-Ohio-139, ¶ 24, citing *State v. Smith,* 12th Dist. No. CA2010-05-047, 2011-Ohio-1476, ¶ 33. To establish self-defense in a case where a defendant used deadly force, such as the case here, appellant must prove: "(1) he was not at fault in creating the situation giving rise to the affray, (2) he had a bona fide belief he was in imminent danger of death or great bodily harm and that his only means of escape from such danger was the use of deadly force, and (3) he did not violate any duty to retreat or avoid the danger." *Id.*, citing *State v. Gray*, 12th Dist. No. CA2010-03-064, 2011-Ohio-666, ¶ 43. If appellant "fails to prove any one of these elements by a preponderance of the elements he has failed to demonstrate that he acted in self-defense." *Id.*, citing *State v. Jackson*, 22 Ohio St.3d 281, 284 (1986).

{¶ 10} At trial, Jordan Hardy, a friend who was with appellant on the night of the

shooting, was the first to testify. Hardy stated that he picked up appellant and another individual, Robert Reece, on the evening of October 6, 2011, in his mother's Buick LeSabre. Hardy explained that he had previously discussed plans to "set up a robbery with [appellant]" and that the trio drove to the intended robbery victim's home and waited outside. Hardy further stated that be brought with him a 9 mm handgun and made it known to Reece and appellant that the gun was in the middle console of the vehicle.

{¶ 11} After the intended robbery victim did not "show," Hardy testified that he eventually drove Reece and appellant to the victim's Fairview Residence so that appellant could collect a debt that was owed to him. After initially approaching the front of the residence, appellant instructed Hardy to pull around to an alleyway at the back of the residence. Reece and appellant then climbed a staircase and approached the back of the Fairview Residence while Hardy waited in the car. It was at this time that Hardy realized the gun was no longer in the vehicle. After sitting in the car for a brief time, Hardy heard one gunshot and a pause followed by "a couple more" gunshots. Hardy then observed Reece and appellant "running down the stairs to the car." The pair got into the vehicle and instructed Hardy to drive away.

{¶ 12} Hardy testified appellant looked "sad, regretful, kind of angry in the same sense." According to Hardy, appellant described the sequence of events at the Fairview Residence as follows:

> HARDY: [Appellant] said there were words over the money that was owed within the debt, and it started to become argument [sic], and something happened or other. And I was told that [the victim] had came [sic] at [appellant] with a knife, and [appellant] told him to stop and back up continuously, and [the victim] wouldn't do it. And it got to the point where, I guess, he tried to slap his hand.
>
> STATE: Who tried to slap whose hand?

HARDY: [The victim] tried to slap [appellant's] hand.

STATE: Okay.

HARDY: From what I was told, that's when the first shot happened.

STATE: And did—did [appellant] tell you where the first shot ended up?

HARDY: I don't—I don't know for sure. I believe the leg.

STATE: All right. And then what happened after that shot?

HARDY: I was told [the victim] fell to the ground and was starting to get back up, assuming he still had the knife in his hand.

STATE: Now, when you say, I'm assuming he had the knife in his hand, is that what [appellant] told you? He got up and still had the knife in his hand?

HARDY: Yes.

STATE: He told you that. All right. So then what happened?

HARDY: And I guess a few—I'm supposedly guessing a few more shots had came [sic] out after that.[1]

STATE: All right. Did [appellant] tell you where the next several shots or couple shots went?

HARDY: He said he thought the chest.

     * * *

And somewhere in the back.

{¶ 13} Reece then explained to Hardy, without dispute or contradiction from appellant, that the victim was shot in the back because "if he wasn't dead, we would all get in trouble." Hardy observed that appellant had the gun in his possession at this time. Testimony also revealed that the gun used in the shooting was sold that night to a George Maddox, whose

---

1. Hardy later clarified that he believed he heard three to five shots fired.

mother disposed of the gun in a garbage bin after learning that the gun was "hot." The gun was never recovered.

{¶ 14} The victim's brother, James Butler, testified regarding leg problems suffered by the victim. Butler stated that the victim had constant problems with his legs, feet, and knees, as well as gout. Butler explained that the victim "rarely got out of bed * * * in the last few months because he * * * was having problems with his legs and it hurt him to get up. He would leave the door open for me, and I would bang on the door, and he would yell, [']Come on in['], and he was always in bed." When the victim did get out of bed, Butler witnessed the victim often using a cane or a walker. Butler also testified that he saw his brother on the two days preceding his death and stated that the victim did not move around much.

{¶ 15} Next, Detective James Smith with the Hamilton City Police Department testified that he was the first detective on the scene on the night of October 6, 2011. Detective Smith explained that he processed the scene by taking a series of photographs depicting various images of the Fairview Residence as well as collecting evidence and samples including blood, shell casings, and spent bullets. Through the use of over 50 photographs, Detective Smith explained to the jury the layout of the Fairview Residence, stating that one would enter the residence through a door in the kitchen. From the kitchen, one would proceed through the living room and then into the bedroom, which is connected only by a doorframe that has no attached door. Detective Smith testified that a large blood pool was found in the bedroom of the Fairview Residence where the victim had originally been discovered.

{¶ 16} Detective Smith then attested that a number of shots were fired at a downward angle from the living room of the Fairview Residence into the bedroom. Two bullets made "furrows" along the inside of the doorframe separating the living room and the bedroom. These bullets were later recovered in the bedroom floorboard of the residence. A third bullet was found inside the doorframe while a fourth bullet was found within the mattress of the

victim's bed. A fifth bullet was found on the floor inside the bedroom. Various shell casings were found inside the living room of the residence.

{¶ 17} In concluding that several of these bullets were fired at a downward angle, Detective Smith explained that he used a "laser trajectory unit" to "measure the degree relative to the ground plane floor of the downward angle of the bullet." Specifically, Detective Smith used the laser trajectory unit to measure the path angle of the two bullets that created "furrows" on the doorframe between the living room and bedroom. The laser trajectory unit determined that the ballistic angle for both of the bullets which struck the doorframe were "26 degrees downward" and had come from the living room and into the bedroom. In other words, Detective Smith testified that the bullets were shot from inside the living room and into the bedroom at a downward angle.

{¶ 18} The state's final witness was Dr. Russell Uptegrove, the coroner who performed the autopsy on the victim's body. Dr. Uptegrove explained that, due to sever blockages in the coronary arteries of the victim's heart, the victim would generally be "physically limited" as to the amount and duration of energy he could exert. Dr. Uptegrove also explained his findings as to the various wounds suffered by the victim during the altercation. Dr. Uptegrove determined that one bullet entered the chest of the victim and struck the left atrium of the victim's heart before traveling through his lung and liver. Dr. Uptegrove opined that this was the wound which caused the victim's death. Dr. Uptegrove further demonstrated, through the use of 16 autopsy photographs, the general path of the bullets which entered and exited the victim's body. As to one bullet that entered near the center of the victim's neck, Dr. Uptegrove specifically testified that this bullet traveled at a downward angle and exited the body through the chest of the victim near the clavicle.

{¶ 19} Appellant testified on his own behalf regarding the night of October 6, 2011, corroborating the general outline of events as testified to by Hardy. Appellant disagreed,

however, that he was aware of Hardy's intention to commit a robbery before appellant got into the vehicle with Hardy and Reece. Appellant further claimed that he was unaware that a gun was in the vehicle until sometime just before going to the Fairview Residence. Appellant explained that as the trio approached the Fairview Residence, he recalled that a man known as "Pistol" lived nearby and that Pistol wanted to kill him. Appellant testified he took the gun for protection and placed it in his pants, covering the gun with his shirt.

{¶ 20} As to the events that occurred in the victim's apartment, appellant testified that he and Reece were let into the apartment by the victim. Appellant, Reece, and the victim then proceeded to walk from the doorway in the kitchen, through the victim's living room, and into the victim's bedroom in order to "talk business." At some point in the conversation, the victim asked if appellant would "front him" some cocaine in exchange for pain medication. Appellant informed the victim he would not "front him" anything but that he would take the victim's television in exchange for cocaine. Appellant's testimony then proceeded as follows:

> APPELLANT: While I'm talking to him, he's like nodding his head yeah, but he's not saying anything, so I'm going to the TV, like to grab—to scoot the TV off, to grab it so I could take it, and when I'm turning to grab the TV, I see him getting out of bed, and he's standing up out of bed, and I heard a knife. I heard a snap. I'm not thinking nothing [sic] about it. [Reece]'s upstairs too. He's in the doorway.
>
> And [Reece] was like, "Watch out, boy, he has a knife."
>
> So I stopped.
>
> * * *
>
> I stop grabbing the TV, and I turn around, and I see him coming at me, and he has the knife out in his hand.
> * * *
>
> And he's telling me that I can afford to front him.

* * *

DEFENSE:    Okay. And as he's coming toward you with the knife, what do you say?

APPELLANT: I tell him to back up, and I'm backing up while I'm telling him to back up, and he's still coming.

DEFENSE:    Okay. So as you're backing up, he's coming toward you?

APPELLANT: Yes.

DEFENSE:    Is he coming toward you with the knife?

APPELLANT: Yes.

DEFENSE:    Does he have the knife out?

APPELLANT: Yes.

DEFENSE:    Did you feel threatened?

APPELLANT: Yes.

DEFENSE:    And how did that make you feel?

APPELLANT: It didn't make me feel good.

* * *

Made me—I was scared to be honest with you.

* * *

DEFENSE:    What else [did] you do?

* * *

APPELLANT: I started side, like sidestepping, and he's pivoting while I'm sidestepping, and that's when I took out the gun, and I back up all the way against the wall to where I can't back up no more [sic]. I'm on my tippy toes.

* * *

When he gets a little bit closer, that's when I go on my tippy toes against the wall, and I just—I

- 9 -

seen [sic] the knife coming at me, and I just closed my eyes and I just shot.

\* \* \*

DEFENSE: When you shot him, what was your intention?

APPELLANT: To get him to stop coming towards me with that knife. I didn't want to be stabbed.

{¶ 21} Appellant explained that he was unaware how many times he fired the gun, where he was aiming, or what part of the victim's body he struck, as his eyes were closed the entire time. After appellant opened his eyes, he stated that the victim appeared to have his "mad face on," was cussing and yelling, and was alive when appellant ran out of the room.

{¶ 22} On cross-examination, appellant clarified that he was backed up against a dresser in the victim's bedroom just inside the doorframe between the living room and bedroom. However, appellant stated that he was unable to escape through this nearby doorframe, even though there was no door attached to the frame to block or otherwise hinder access into or out of the room. Therefore, he opened fire while standing in the bedroom. Appellant testified that he was unaware how shell casings were found in the living room of the Fairview Residence when all of the shooting occurred in the bedroom.

{¶ 23} Although we consider the credibility of witnesses in a manifest weight challenge, we are mindful that the determination regarding witness credibility rests primarily with the trier of fact. *State v. Jones*, 12th Dist. No. CA2012-04-077, 2013-Ohio-654, ¶ 19. The trier of fact is in the best position to view the witnesses and observe their demeanor, gestures, and voice inflections—observations that are critical to determining a witness's credibility—and the trier of fact is free to accept or reject any or all the testimony of any witness. *State v. Hill*, 75 Ohio St.3d 195, 205 (1996); *State v. Antill*, 176 Ohio St. 61, 66 (1964).

{¶ 24} In this case, based upon appellant's testimony alone, the jury could have found

that appellant created the situation giving rise to the affray, and thereby negating a claim of self-defense, by attempting to take the victim's television without specific confirmation that the victim agreed to trade the television for cocaine. *See generally State v. Tucker*, 2012-Ohio-139 at ¶ 24. Furthermore, the testimony of Detective Smith, if believed by the jury, stated that appellant must have been in the living room and shooting at a downward angle when he fired shots at the victim. Thus, appellant would not have been in close proximity to the alleged knife-wielding victim, who was still in the bedroom, and appellant could have escaped through the kitchen door. As such, the jury could have found that appellant had an alternative means of retreat without using deadly force. Although Detective Smith's testimony contradicted that of appellant, a conviction is not against the manifest weight of the evidence simply because the trier of fact believes the state's testimony. *State v. Guzzo*, 12th Dist. No. CA2003-09-232, 2004-Ohio-4979, ¶ 13.

{¶ 25} Therefore, upon review of the record, we find that the jury did not lose its way or create a manifest miscarriage of justice in finding appellant guilty of murder. This is not a rare and exceptional case where the evidence weighs heavily against conviction. *See State v. Coldiron*, 2004-Ohio-5651 at ¶ 24. Accordingly, appellant's conviction is supported by the manifest weight of the evidence and his first assignment of error is overruled.

{¶ 26} Assignment of Error No. 2:

{¶ 27} IT WAS PLAIN ERROR AND AN ABUSE OF DISCRETION TO PERMIT ALL OF THE PHOTOGRAPHS OF THE DECEASED INTO EVIDENCE EVEN BY STIPULATION AS THE ADMISSION OF SUCH PHOTOGRAPHS IS PRECLUDED BY EVIDENCE RULE 403(A) AND (B).

{¶ 28} In his second assignment of error, appellant contends that it was plain error and an abuse of discretion for the trial court to admit 16 autopsy photographs of the victim depicting his various injuries when the parties has stipulated that the victim had died from

multiple gunshots and the coroner's report was admitted by stipulation.  Specifically, appellant argues that the admission of these photographs was in contravention of Evid.R. 403(A) and (B).

{¶ 29} In general, the "admission or exclusion of photograph evidence is left to the discretion of the trial court." *State v. Blankenburg*, 197 Ohio App.3d 201, 2012-Ohio-1289, ¶ 92 (12th Dist.).  However, the failure of appellant to object to the admission of these photographs at trial waives all but plain error.  *State v. Hartman*, 93 Ohio St.3d 274, 281 (2001).

{¶ 30} "To constitute plain error, the error must be obvious on the record, palpable, and fundamental, so that it should have been apparent to the trial court without objection." *State v. Dominguez*, 12th Dist. No. CA2011-09-010, 2012-Ohio-4542, ¶ 26.  "Plain error does not exist unless the appellant can establish that the outcome of the trial would have been different but for the trial court's allegedly improper action." *Id.*; *State v. Waddell*, 75 Ohio St.3d 163, 166, 1996-Ohio-100.  "Notice of plain error * * * is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *State v. Long*, 53 Ohio St.2d 91 (1978), paragraph three of the syllabus; *State v. Phillips*, 74 Ohio St.3d 72, 83, 1995-Ohio-171.

{¶ 31} Evid.R. 403 permits the exclusion of relevant evidence on the grounds of prejudice, confusion, and undue delay.  The rule states:

> (A) **Exclusion mandatory**.  Although relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury.
>
> (B) **Exclusion discretionary**.  Although relevant, evidence may be excluded if its probative value is substantially outweighed by considerations of undue delay, or needless presentation of cumulative evidence.

In other words, Evid.R. 403 provides that "a trial court may reject an otherwise admissible

photograph that, because of its inflammatory nature, creates a danger of prejudice that substantially outweighs the probative value of the photograph as evidence, but absent such danger the photograph is admissible." *Blankenburg* at ¶ 92, citing *State v. Morales*, 32 Ohio St.3d 252, 257 (1987). The trial court has broad discretion in balancing the probative value against the danger of unfair prejudice. *State v. Harcourt*, 46 Ohio App.3d 52, 55 (12th Dist.1988).

{¶ 32} The 16 autopsy photographs depict the victim's body including various bullet entry and exit wounds and can be considered gruesome. *See State v. DePew*, 38 Ohio St.3d 275, 281-282 (1988). "However, the mere fact that a photograph is gruesome or horrendous is not sufficient to render it *per se* inadmissible." *Id.*, quoting *State v. Maurer*, 15 Ohio St.3d 239, 265 (1984). The photographs' "probative value must outweigh the danger of prejudice, and they must not be repetitive or cumulative." *Id.*

{¶ 33} The probative value of these photographs is beyond dispute, as they are manifestly relevant to show the manner and circumstances surrounding the victim's death, the nature and type of wounds he suffered demonstrating a purpose to cause death, and the trajectory and angle of the bullets which entered the wounds. These photographs were specifically used by Dr. Uptegrove to demonstrate the downward path the bullets took as evidence that the bullets were fired at an angle which would not indicate self-defense. *See State v. Harcourt* at 55. "[P]hotographs illustrating the type of wounds suffered by the victim and those corroborating the testimony of the coroner have significant probative weight that can overcome potential prejudice." *State v. Clay*, 7th Dist. No. 08 MA 2, 2009-Ohio-1204, ¶ 61, citing *State v. Moore*, 81 Ohio St.3d 22, 32 (1998); *State v. Allen*, 73 Ohio St.3d 626, 636 (1995). Specifically, the photographs relating to the angle and location of the bullet holes were important to prove specific intent because of appellant's claim that he acted in self-defense. The photographs and oral testimony relating to the entry and exit wounds tended to

refute any claim of self-defense and, therefore, had a high probative value which outweighed their prejudicial impact. *State v. Taylor*, 8th Dist. No. 65711, 1995 WL 663267, * 15 (Nov. 9, 1995), *affirmed*, 78 Ohio St.3d 15 (1997). Thus, the probative value of the photographs was substantial, while the danger of unfair prejudice, though present, was relatively limited.

{¶ 34} Furthermore, we find that the photographs were not a needless presentation of cumulative evidence. Appellant argues that the photographs were cumulative in nature because the parties had stipulated to the admission of the coroner's report and that the victim died from multiple gunshot wounds. However, the photographs were not cumulative and, instead, were used to corroborate the oral testimony concerning the trajectory of the bullets and the likelihood that appellant did not shoot the victim in self-defense.

{¶ 35} Therefore, based upon our review of the record, the probative value of these photographs was not substantially outweighed by the danger of unfair prejudice or the needless presentation of cumulative evidence. *See* Evid.R. 403(A) and (B). As such, we find that the trial court did not err in admitting these photographs and that the outcome of the trial would not have been different had the photographs been excluded. Accordingly, appellant's second assignment of error is overruled.

{¶ 36} Assignment of Error No. 3:

{¶ 37} IT WAS ERROR FOR THE [TRIAL] COURT TO REFUSE TO GIVE A JURY CHARGE IN THE INSTANT CASE OF THE LESSER CHARGE OF INVOLUNTARY MANSLAUGHTER [SIC] AS REQUESTED BY DEFENDANT.

{¶ 38} In his third assignment of error, appellant contends that it was an abuse of discretion for the trial court not to give a voluntary manslaughter jury instruction.[2]

---

2. Although appellant indicates in his brief that an instruction relating to "involuntary manslaughter" should have been given to the jury, appellant clarified in his reply brief and at oral argument that his argument relates to a jury instruction for "voluntary manslaughter."

{¶ 39} "Jury instructions are matters left to the sound discretion of the trial court." *State v. Tucker*, 12th Dist. No. CA2010-10-263, 2012-Ohio-139, ¶ 23. Therefore, an appellate court "reviews the trial court's decision refusing to provide the jury with a requested jury instruction for an abuse of discretion." *Id.*; *State v. Wolons*, 44 Ohio St.3d 64, 68 (1989). As noted above, a trial court abuses its discretion when it acts unreasonably, arbitrarily, or unconscionably. *Tucker* at ¶ 23.

{¶ 40} "A trial court must give the jury all instructions that are relevant and necessary for the jury to weigh the evidence and fulfill its duty as the fact finder." *State v. Hamilton*, 12th Dist. No. CA2001-04-098, 2002-Ohio-3862, ¶ 8; *State v. Comen*, 50 Ohio St.3d 206, 210 (1990). However, a trial court does not err in failing to provide a certain jury instruction requested by a party "where the evidence is insufficient to support the instruction." *State v. Burchett*, 12th Dist. Nos. CA2003-09-017, CA2003-09-018, 2004-Ohio-4983, ¶ 26; *Rice v. City of Cleveland*, 144 Ohio St. 299 (1944).

{¶ 41} Voluntary manslaughter is an inferior degree of murder, for its elements are contained within the indicted offense, except for one or more additional mitigation elements. *State v. Rice*, 12th Dist. No. CA2003-01-015, 2004-Ohio-697, ¶ 31, citing *State v. Shane*, 63 Ohio St.3d 630, 632 (1992). Specifically, R.C. 2903.02(A) provides that "[n]o personal shall purposely cause the death of another * * *." On the other hand, R.C. 2903.03(A), governing voluntary manslaughter, provides that "[n]o person, while under the influence of sudden passion or in a sudden fit of rage, either of which is brought on by serious provocation occasioned by the victim that is reasonably sufficient to incite the person into using deadly force, shall knowingly cause the death of another * * *."

{¶ 42} "Even though voluntary manslaughter is not a lesser included offense of murder, the test for whether a judge should instruct a jury on voluntary manslaughter when a defendant is charged with murder is the same test to be applied when an instruction on a

lesser included offense is sought. *Rice* at ¶ 31, citing *Shane* at 37. A trial court should give a lesser included offense instruction "only where the evidence presented at trial would reasonably support both an acquittal on the crime charged and a conviction upon the lesser included offense." *Id.* at ¶ 32, citing *State v. Thomas*, 40 Ohio St.3d 213 (1988), paragraph two of the syllabus.

{¶ 43} "For example, a trial court will give an instruction on the inferior degree offense of voluntary manslaughter in a murder trial only when the jury could reasonably find against the state on the element of purposefulness and still find for the state on the defendant's act of killing another." *Rice* at ¶ 33. However, "an instruction is not warranted every time 'some evidence' is presented on a lesser included or inferior degree offense." *Id.* Thus, if insufficient evidence of provocation is presented, so that no reasonable jury would decide, by a preponderance of the evidence, that an actor was reasonably provoked by the victim, the trial judge must, as a matter of law, refuse to give a voluntary manslaughter instruction. *Id.* at ¶ 36; *State v. Harris*, 129 Ohio App.3d 527, 534 (10th Dist.1998). To determine whether the provocation was reasonably sufficient to incite the use of deadly force, "the court must consider the emotional and mental state of the defendant and the conditions and circumstances that surrounded him at the time." *Id.*; *State v. Deem*, 40 Ohio St.3d 205, 211 (1988).

{¶ 44} In this case, there was no evidence adduced at trial that appellant was under the influence of a sudden passion or in a sudden fit of rage due to the victim's conduct. On the contrary, appellant specifically testified that the decision to open fire was a clear-headed decision and that he was not experiencing any feeling of passion or rage at the time.[3]

---

3. Appellant testified at trial as follows:

> STATE:  Clear-headed decision of your mind, no question about
>         that?

Though appellant argues that his feelings of "fear" warrant a voluntary manslaughter instruction, being fearful or scared does not constitute sudden passion or a fit of rage as contemplated by the voluntary manslaughter statute. *See Harris* at 534-535. As such, appellant's testimony fails to satisfy the requirements necessary for a voluntary manslaughter jury instruction. Therefore, appellant's contention that the trial court erred in not instructing the jury on the offense of voluntary manslaughter is without merit. Accordingly, appellant's third assignment of error is overruled.

{¶ 45} Assignment of Error No. 4:

{¶ 46} THE CASE SHOULD BE REVERSED IN THE INSTANT CASE BECAUSE OF INEFFECTIVE REPRESENTATION OF COUNSEL.

{¶ 47} In his fourth assignment of error, appellant argues that he was deprived his right to effective assistance of counsel because trial counsel failed to object to the admission of the autopsy photographs and failed to object to hearsay statements.

{¶ 48} "To establish a claim of ineffective assistance of counsel, a defendant must show that his or her counsel's actions were outside the wide range of professionally competent assistance, and that prejudice resulted by reason of counsel's actions." *State v.*

---

APPELLANT: Yes.

         * * *

STATE: And with clarity of mind, you decided to pull the trigger and point that gun at him with the objective of that bullet hitting his body. You did do that, didn't you?

APPELLANT: Yes, sir, but only to keep him from hurting me.

STATE: I understand that. And that was the only reason, no other reason?

APPELLANT: No other reason, no, sir.

STATE: No passion, no rage, nothing like that, just clarity of mind to do that, correct?

APPELLANT: Yes.

*Ullman*, 12th Dist. No. CA2002-10-110, 2003-Ohio-4003, ¶ 43, citing *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052 (1984). A counsel's performance will not be deemed ineffective unless the appellant demonstrates that "counsel's representation fell below an objective standard of reasonableness and that there exists a reasonable probability that, were it not for counsel's errors, the result of the proceeding would have been different." *Id.*; *Strickland* at 688; *State v. Bradley*, 42 Ohio St.3d 136, 143 (1989). "A reasonable probability is 'a probability sufficient to undermine confidence in the outcome of the proceeding.'" *State v. Fields*, 102 Ohio App.3d 284 (12th Dist.1995), quoting *Strickland* at 694. "A defendant bears the burden of demonstrating ineffective assistance of counsel." *State v. Bishop*, 12th Dist. No. CA97-07-081, 1998 WL 102994, * 1 (Mar. 9, 1998), citing *State v. Hamblin*, 37 Ohio St.3d 153, 155-156 (1988).

{¶ 49} Appellant's first argument relates to the admission of the autopsy photographs discussed in the second assignment of error. As we have previously determined, the admission of these photographs was not improper. Finding no error in the admission of the photographs, we likewise find no error in trial counsel's failure to object to the admission of these photographs.

{¶ 50} Appellant also contends that trial counsel was ineffective in allowing hearsay to be admitted. Specifically, appellant references five pages in the trial transcript where the state elicited testimony from Hardy regarding Reece's statements that the victim was shot in the back because "if he wasn't dead, we would all get in trouble." Appellant argues that this testimony was admitted without objection and, therefore, trial counsel was ineffective. However, our review of the record indicates otherwise. Not only did trial counsel object, but a sidebar was held between the judge, the state, and trial counsel regarding this testimony wherein the trial court decided to admit the testimony while noting trial counsel's continuing objection. Trial counsel then objected an additional two times regarding the admission of this

testimony.

{¶ 51} Thus, as the photographs were not improperly admitted at trial and the alleged hearsay statements referenced in appellant's brief were objected to by trial counsel, we find appellant's arguments that he received ineffective assistance of trial counsel meritless. As such, appellant's fourth assignment of error is overruled.

{¶ 52} Assignment of Error No. 5:

{¶ 53} IT WAS PLAIN ERROR AND AN ABUSE OF DISCRETION FOR THE [TRIAL] COURT NOT TO GIVE A CHARGE TO THE JURY RELATIVE TO R.C. 2901.09 THAT THE DEFENDANT APPELLANT HAD NO DUTY TO RETREAT BEFORE USING FORCE, INCLUDING DEADLY FORCE IN SELF-DEFENSE.

{¶ 54} In his fifth and final assignment of error, appellant contends the trial court erred in not instructing the jury on the "castle doctrine." More precisely, appellant argues that, when the altercation occurred, he was lawfully within the Fairview Residence and, therefore, the trial court should have instructed the jury that appellant had no duty to retreat.

{¶ 55} As stated above, jury instructions are matters left to the sound discretion of the trial court and a determination not to instruct the jury shall not be reversed absent an abuse of discretion. *State v. Tucker*, 2012-Ohio-139 at ¶ 23. Furthermore, when a party fails to object to jury instructions before the jury retires, the party waives any claim of error regarding the instructions absent plain error. *See* Crim.R. 30(A); Crim.R. 52(B); *State v. Williford*, 49 Ohio St.3d 247, 251 (1990).

{¶ 56} R.C. 2901.09 codifies a form of self-defense as the castle doctrine and states that "a person who lawfully is in *that* person's residence has no duty to retreat before using force in self-defense * * *." (Emphasis added.) Initially, we note that a review of the jury instructions reveals that the jury was instructed on the castle doctrine, when the trial court stated that "[a] person who lawfully is in his residence has no duty to retreat before using

force in self-defense or defense of his residence."

{¶ 57} However, even if this statement had not been read to the jury, appellant was still not entitled to an instruction that he was lawfully within the Fairview Residence and had no duty to retreat. The mere fact that one is lawfully inside the residence of another does not invoke the strictures of the castle doctrine. *State v. Lewis*, 8th Dist. No. 97211, 2012-Ohio-3684, ¶ 13 (stating that the castle doctrine provides that a person "who is in *his or her own home* has no duty to retreat before using self-defense"). Rather, to invoke the castle doctrine in this case, appellant must have been the lawful occupant or resident of the Fairview Residence. *See State v. Bushner*, 9th Dist. No. 26532, 2012-Ohio-5996, ¶ 16 (finding that a defendant would be entitled to a castle doctrine instruction "if he *was lawfully occupying the residence* at the time he used deadly force"); *State v. Kozlosky*, 195 Ohio App.3d 343, 2011-Ohio-4814, ¶ 25 (8th Dist.) (holding that the castle doctrine creates a rebuttable presumption that a defendant acted in self-defense when attempting to expel a person from *the defendant's* home). As appellant was not the owner or lawful occupant of the Fairview Residence, the castle doctrine is inapplicable to this case. Accordingly, appellant's fifth and final assignment of error is overruled.

{¶ 58} Judgment affirmed.

S. POWELL and M. POWELL, JJ., concur.