[Cite as *State v. Barron*, 2022-Ohio-102.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

WARREN COUNTY

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Appellee, | : | CASE NO. CA2020-12-088 |
| | : | O P I N I O N |
| - vs - | | 1/18/2022 |
| | : | |
| DAVID BARRON, | : | |
| Appellant. | : | |

CRIMINAL APPEAL FROM WARREN COUNTY COURT OF COMMON PLEAS
Case No. 20CR36769

David P. Fornshell, Warren County Prosecuting Attorney, and Kirsten A. Brandt, Assistant Prosecuting Attorney, for appellee.

William F. Oswall Jr., for appellant.


**BYRNE, J.**

{¶1}    David Barron appeals from his convictions in the Warren County Court of Common Pleas for various prostitution-related offenses.  For the reasons discussed below, we affirm.

**I. Procedural and Factual Summary**

**A. Indictment**

{¶2}    In June 2020, a Warren County grand jury returned a 29-count indictment

against Barron. Relevant to this appeal, the indictment charged Barron with six counts of trafficking in persons. Three of those counts related to one victim, who we will call "Amy[1]." The other three counts related to a different victim, "Rose." Barron was also charged with six counts of promoting prostitution. Again, three of the promoting prostitution counts regarded Amy and the other three concerned Rose. Each count of the indictment covered a different period of time between March 10, 2020, through May 2, 2020.[2] These time periods roughly corresponded to time that the state alleged Barron spent at three different hotels at which he forced Amy and Rose to engage in prostitution for him. Barron was also charged with the felonious assault of Rose. The case proceeded to a jury trial.

### B. Evidence Presented at Trial

### 1. Amy's Testimony

{¶3} Amy testified that she had known Barron for "a while," through a mutual friend. They reconnected in January or February of 2020. In March 2020, Barron invited her to his hotel room at the Super 8 in Mason, Ohio. Initially, she just went over to "chill, kick it, talk." There, she met Rose for the first time. She understood that Rose was Barron's girlfriend, but that she also prostituted for him.

{¶4} Amy testified that on a few occasions, she accompanied Rose when Rose would go on "licks," that is, when Rose would meet "johns" for sex. "Johns" are people who were paying for sex. Amy would not participate and would "just sit there with her" to make sure Rose was "all right."

{¶5} Eventually, Barron forced Amy to start going on licks at the Super 8. Amy

---

1. The parties' briefs refer to the victims by their initials. For further privacy and readability, we are using fictionalized first names to refer to the victims.

2. For example, Counts One, Three, and Five were the trafficking in persons counts applicable to Amy. Count One covered March 10, 2020, through April 9, 2020. Count Three covered April 9, 2020, through April 23rd, 2020. And Count Five covered April 23, 2020, through May 2, 2020.

testified that she did not have a choice. She could either do it, or "face the consequences." She had seen what the "consequences" were beforehand because she had seen Barron enforcing consequences with Rose. "Consequences" meant physical assault, including being beaten with switches or phone cords.

{¶6} Barron had rules that he forced Amy and Rose to follow. The moment that they came in the door, they had to get completely undressed. They were not allowed to talk to one another. Depending on his mood, they were not allowed to talk to him. She and Rose could not have password pins on their phones, and he was permitted to access their phones. He required them to have sex with him "all the time." He would have them perform oral sex on him and would set a timer. There were "consequences" if they stopped performing oral sex before the timer was up.

{¶7} Rose was addicted to heroin and methamphetamine. Barron supplied her with narcotics. Amy was not addicted to drugs at the time she first went to the Super 8. She had been clean for two years and was not a methamphetamine user beforehand. But Barron forced Amy to start smoking methamphetamine and she became addicted.

{¶8} Amy and Rose gave the money from the johns to Barron immediately. They were only allowed to hold the money for "like three seconds." Barron then used the money to buy drugs, food, and drink. Amy and Rose were not allowed to keep any of the money and Barron never paid them for their services as prostitutes. As Amy relayed that Barron had explained it to her, "I put a roof over your head and food in your stomach and that's good enough."

{¶9} At the time she became involved in prostitution at the Super 8, Amy had been living in Fairfield with her boyfriend (whom she called her husband) and seven children. When she would cry enough, Barron would let her leave to go see her family. However, he would keep her personal property to make sure "I had a reason to come back." Amy stated

that Barron would keep her wallet, jewelry, wedding ring, and driver's license.

{¶10} In addition to the Super 8, Amy testified that she and Rose prostituted for Barron at two other hotels.[3] As Amy recalled, they were at the Super 8 from approximately March 13 to the beginning of April 2020. Then they were at the Red Roof Inn in Hamilton County for two weeks. Then they were at the Baymont Inn in Mason.[4] Sometimes Barron rented multiple rooms. He would rent the room under "whoever's ID he had."

{¶11} It was the "same system" throughout all three hotels. Barron would create an advertisement on a website for escorts. He took photographs of Amy and Rose, or took "selfies" from their respective phones. He would include the photographs on the advertisement. Barron would text with the johns who responded to the advertisements. Barron would tell Amy and Rose that messages were coming in from the johns and that they needed to "get ready."

{¶12} Amy recalled an incident that occurred at the Red Roof Inn. Rose was "dope sick" from heroin withdrawal. Barron was "taking his time going to get [heroin] for her." Rose locked herself in the bathroom, which angered Barron. When Rose came out, he began beating her. When she tried to leave the room, he smacked her, knocking her unconscious.

{¶13} Amy recalled another time when Barron got mad at her for giving her phone number to one of Barron's friends. Later, when they were smoking methamphetamine, he took the "hot glass bubble" and touched it to her skin, burning her five different times. The state produced photographs of injuries corroborating the abuse. The state further introduced a text message conversation between Amy and Barron that took place on April

---

3. According to a police detective, the incidents of prostitution occurred at all three hotels between March 10, 2020, and May 2, 2020.

4. Evidence at trial also indicates that they returned to the Super 8 in May 2020. The hotels are located across the street from one another.

22, 2020.  Amy texted Barron, "I cant do the abuse shit day."[5]  Barron responded: "Me either. I hate hitting women.  I'm so sorry.  I didn't know those burns would be that bad.  Im sorry.  That the worst thing I ever did to a woman."

### 2. Officer John Werner's Testimony

{¶14}  Mason Police Officer John Werner testified that on May 1, 2020, he responded to the Mason Super 8 because a clerk reported finding narcotics in a hotel room. Upon searching the room, he located methamphetamine.  In a drawer, he found Amy's wallet, containing her identification card.  He also found two rings in the drawer.  He found an identification card for Barron as well as the identification card of a person named "Andre Henderson," which was a name that police discovered that Barron used to rent some of the hotel rooms.

{¶15}  Officer Werner testified that he received a call from another officer for assistance.  He responded to the area between the Baymont Inn and Super 8, where he found the other officer with Rose.  She was very upset and said that she was trying to get back to her hotel room at the Super 8, the same room Officer Werner had just searched. She said she was "being victimized and pimped out of the hotels."

{¶16}  Based on what Rose told him, Officer Werner advised other officers to be on the lookout for a red/burgundy Chevrolet Impala.  This was Amy's father's car, which, according to Amy, Barron used for himself almost every day.

### 3. Officer Scott Burdick's Testimony

{¶17}  Mason Police Officer Scott Burdick testified that the next day, he observed the red vehicle in question in the parking lot of the Baymont Inn.  He confirmed the license plate and saw that Barron was inside the vehicle.  He backed out of the parking lot and went

---

5. There was testimony that "Day" was Barron's nickname.

down the street, waiting for back up to arrive and to see what would happen. Approximately one hour later the vehicle left the Baymont Inn parking lot. Barron was driving the vehicle and Amy was the front seat passenger.

{¶18} Officer Burdick followed the vehicle and eventually stopped it for a turn signal violation. Police removed Barron from the vehicle, who acknowledged he had a suspended driver's license. Officers detected a strong odor or marijuana emanating from the vehicle and upon searching the vehicle, Officer Burdick found individually wrapped baggies of marijuana. Barron admitted that the marijuana was his and specifically stated that it was not Amy's marijuana. He said that she was a "good girl" and did not have anything to do with the marijuana and was not "involved in anything." According to Officer Burdick, Barron seemed very concerned about the police speaking to Amy and was very interested in what she had to say.

### 4. Detective Jeff Wyss's Testimony

{¶19} Police transported Barron and Amy to the Mason Police Department, where Mason Police Detective Jeff Wyss interviewed them separately. Detective Wyss testified that Amy was "visibly distraught" during the interview. She denied that she worked for Barron as a prostitute, although she admitted that he had asked her to do so. During Amy's interview, Detective Wyss recalled that Barron was "shouting at the officers to get me," for Detective Wyss to "hurry" and come ask him about drugs.

{¶20} Several days later, Detective Wyss interviewed Amy again. According to Amy, she "broke down" and told Detective Wyss what Barron was forcing her to do. On May 6, 2020, Barron called Amy from the Warren County Jail. In a recorded call presented at trial, Barron told Amy, "they got me facing five years over what you said." He implored her, "Just don't come to court. Just don't come to no court dates."

{¶21} Detective Wyss found evidence on Barron's cell phone that he had visited a

website used for advertising escort services. He searched Barron's cell phone number on that same website. The search returned an advertisement for sexual services. The advertisement listed Barron's phone number and indicated "qv60hhr100." Detective Wyss testified that he knew this meant $60 for a "quick visit" or $100 for half an hour. The advertisement included photographs of Rose.

{¶22} Detective Wyss obtained a search warrant and downloaded the content of Barron's cell phone. Detective Wyss downloaded text messages, photographs, and videos from the phone. Much of that content was made into exhibits and entered into evidence at trial. In text conversations, Barron referred to his "line of work" as "pussy sell." He referred to himself as a "pimp" and many of his messages appeared related to the operation of a prostitution business. Photographs taken from Barron's phone matched the photographs that were posted on the escort website featuring Rose.

{¶23} The state subpoenaed Rose to testify at trial but she did not appear.

### C. Crim.R. 29 Motion and Sentencing

{¶24} At the conclusion of the state's case, Barron moved for acquittal under Crim.R. 29. The trial court granted Barron's motion with respect to the counts of the indictment where Rose was the victim, except for the count of felonious assault.

{¶25} Barron did not present a defense case. The jury found Barron guilty of trafficking in persons and promoting prostitution, all with respect to Amy, as well as the felonious assault count with respect to Rose.[6]

{¶26} The trial court sentenced Barron to prison. The court imposed separate prison terms for each count of trafficking in persons and promoting prostitution but ran those

---

6. Any remaining counts of the 29-count indictment were either dismissed by the court via Barron's Crim.R. 29 motion or resolved by the jury through a guilty or not guilty verdict. Those counts are not relevant to this appeal and thus an explanation for the disposition of each count is unnecessary.

sentences concurrent to one another. The court imposed a consecutive prison term with respect to Barron's conviction for the felonious assault of Rose. Barron assigns seven errors in this appeal.

## II. Law and Analysis

{¶27} Assignment of Error No. 1:

{¶28} THE FELONIOUS ASSAULT CHARGE RELATING TO [ROSE] MUST BE REVERSED BECAUSE VENUE WAS NOT PROPERLY ESTABLISHED.

{¶29} Barron argues that the felonious assault count against Rose was premised on a criminal act that took place at the Red Roof Inn in Hamilton County and the state failed to establish that venue was appropriate in Warren County.

### A. Law Applicable to Venue

{¶30} "Venue is not a material element of the offense, yet it is a fact that must be proved beyond a reasonable doubt, unless it is waived by the defendant." *State v. Birt*, 12th Dist. Butler No. CA2012-02-031, 2013-Ohio-1379, ¶ 27; *State v. Headley*, 6 Ohio St.3d 475, 477 (1983). Venue lies in any jurisdiction in which the offense or any element of the offense was committed. R.C. 2901.12(A).

{¶31} R.C. 2901.12(H) provides that when an offender commits offenses in different jurisdictions as part of a "course of criminal conduct," venue lies for all the offenses in any jurisdiction in which the offender committed one of the offenses or any element of one of those offenses. *See also State v. Hubbard*, 12th Dist. Butler No. CA2006-10-248, 2008-Ohio-3379, ¶ 11. R.C. 2901.12(H) further provides that "any of the following is prima-facie evidence of a course of criminal conduct:"

> (1) The offenses involved the same victim, or victims of the same type or from the same group.

> (2) The offenses were committed by the offender in the offender's same employment, or capacity, or relationship to

another.

(3) The offenses were committed as part of the same transaction or chain of events, or in furtherance of the same purpose or objective.

\* \* \*

## B. Whether Venue Was Proper in Warren County

{¶32} Barron argues that the only "course of criminal conduct" evidence presented by the state at trial was that the offenses involved the same victim or victims. He points out that, except for the felonious assault of Rose that occurred in Hamilton County, he was acquitted of every count of the indictment that involved Rose. Thus, he argues that Rose was not the "same victim" for any other offense of which he was convicted, and so the Warren County Court of Common Pleas lacked venue with respect to Barron's assault of Rose.

{¶33} A careful review of the record reveals that the facts and circumstances in evidence were sufficient to demonstrate that venue properly lay in both Warren County and Hamilton County.

{¶34} First, R.C. 2901.12(H)(1) refers not only to "the same victim," but also to "victims of the same type or from the same group." The state argues that Amy and Rose were "victims of the same type or from the same group." Barron argues that the state is incorrect because "such an interpretation of R.C. 2901.12(H) is far too attenuated." Barron fails to explain why such an interpretation is "far too attenuated." We conclude that the state is correct. The evidence at trial established that Barron assaulted Rose in the course of his efforts to control Amy and Rose through force and intimidation. Barron need not be convicted of trafficking or promotion of prostitution with regard to Rose in order for Barron's assault of Rose to place her in the same class of victims as Amy, who was also subject to Barron's use of force and intimidation.

{¶35} Second, even if Barron were correct that Rose and Amy may not qualify as "victims of the same type or from the same group," the state still presented prima facie evidence demonstrating that venue is appropriate in Warren County because the evidence showed that Barron's assault of Rose took place as part of "the offender's same employment, or capacity, or relationship to another" as described in R.C. 2901.12(H)(2), and "in furtherance of the same purpose or objective" as described in R.C. 2901.12(H)(3).

{¶36} Amy's testimony, along with the voluminous documentary evidence, demonstrated that Barron, over the course of two months, operated a prostitution business at two hotels in Warren County and one hotel in Hamilton County. As part of the operation of the business, he rented rooms at the hotels. He posted advertisements online seeking to recruit johns. According to Amy, he directed her and Rose to have sex with the johns and collected the money obtained from the johns. Amy testified that Barron provided food, drink, and narcotics to her and Rose. Amy testified that he maintained control over Rose and her in both Hamilton and Warren Counties by plying them with narcotics and by using force and intimidation. Finally, according to Amy, it was the "same system" at each of the three hotels.

{¶37} The evidence established that the felonious assault of Rose occurred at the Red Roof Inn during the ongoing course of the prostitution business operated by Barron in Warren County and Hamilton County. The evidence showed that Barron committed the offenses of which he was convicted in his same employment or capacity, i.e., his work as a "pimp." R.C. 2901.12(H)(2). The evidence also established that Barron committed the offenses in furtherance of the same purpose or objective, which was to financially profit from selling the bodies of Amy and Rose. R.C. 2901.12(H)(3). *See State v. Rankin*, 12th Dist. Clinton No. CA2004-06-015, 2005-Ohio-6165, ¶ 23 (noting that the record contained "ample evidence" showing a course of criminal conduct, including same victim, same modus

operandi, and same purpose).

{¶38} Accordingly, venue on the felonious assault charge was proper in both Warren County and Hamilton County and it was not improper for the state to pursue charges against Barron in Warren County. R.C 2901.12(H). We overrule Barron's first assignment of error.

{¶39} Assignment of Error No. 2:

{¶40} BECAUSE THE OFFENSE OF PROMOTING PROSTITUTION IS MORE SPECIFIC THAN THE GENERAL OFFENSE OF TRAFFICKING IN PERSONS, WHICH IS A GENERAL OFFENSE, UNDER R.C 1.51, THE SPECIFIC OFFENSE OF PROMOTING PROSTITUTION MUST PREVAIL AND THE CONVICTIONS FOR TRAFFICKING IN PERSONS MUST BE REVERSED.

{¶41} Barron argues that the offense of promoting prostitution (R.C. 2907.22[A][2]), is a more specific offense than the offense of trafficking in persons (R.C. 2905.32[A][1]), and that pursuant to R.C. 1.51 he could not be convicted of trafficking in persons if he was convicted of promoting prostitution.

**A. Standard of Review**

{¶42} Barron failed to argue in the proceedings before the trial court that he should have been charged with promoting prostitution rather than trafficking in persons. Barron has therefore waived all error except plain error. *State v. Evick*, 12th Dist. Clermont No. CA2018-03-016, 2019-Ohio-2791, ¶ 24. To constitute plain error there must be a deviation from a legal rule. *State v. Barnes*, 94 Ohio St.3d 21, 27 (2002). Second, the error must be fundamental, palpable, and obvious on the record such that it should have been apparent to the court without an objection. *State v. Barnette*, 12th Dist Butler No. CA2012-05-099, 2013-Ohio-990, ¶ 30. Third, the error must have affected Barron's substantial rights, that is, the error must have affected the outcome of the trial. *Barnes* at 27. An appellate court will take notice of plain error with "utmost caution, under exceptional circumstances and

only to prevent a manifest miscarriage of justice." *State v. Baldev*, 12th Dist. Butler No. CA2004-05-106, 2005-Ohio-2369, ¶ 12.

**B. Analysis**

{¶43} The trafficking in persons statute provides:

> A prosecution for a violation of this section does not preclude a prosecution of a violation of *any other section* of the Revised Code. One or more acts, a series of acts, or a course of behavior that can be prosecuted under this section or any other section of the Revised Code may be prosecuted under this section, the other section of the Revised Code, *or both sections.* * * *.

(Emphasis added.) R.C. 2905.32(D). Based on the express language of the trafficking in persons statute, the state may prosecute a defendant for trafficking in persons and may also prosecute a defendant for any other offense in the Revised Code that arises from the same act, series of acts, or course of behavior. Thus, to the extent any of the acts involved in the trafficking in persons counts arose from the same acts involved in the promoting prostitution counts, a prosecution under both sections was expressly authorized by statute.

{¶44} Barron argues that *State v. Volpe*, 38 Ohio St.3d 191 (1988), prevents him from being convicted of trafficking in persons if he was convicted of the more specific offense of promoting prostitution. In *Volpe*, the Ohio Supreme Court held that, where "there is no manifest legislative intent that a general provision of the Revised Code prevail over a special provision, the special provision takes precedence." *Volpe* at syllabus. In *Volpe* the state charged the defendants with "gambling," in violation of R.C. 2915.02, a misdemeanor, and possession of criminal tools, in violation of R.C. 2923.24, a felony. *Id.* at 191-192.

{¶45} Former R.C. 2915.02(A)(5) prohibited possession of gambling devices, while R.C. 2923.24 more generally prohibits possession of "criminal tools."[7] Relying upon R.C.

---

7. R.C. 2915.02 has been amended since the Ohio Supreme Court decided *Volpe*. All references to the statute in this opinion are with respect to this earlier version of the statute.

1.51[8], the supreme court determined that R.C. 2915.02(A)(5) and R.C. 2923.24 were irreconcilable. *Id.* at 193. The court reasoned that, "since R.C. 2915.02 and 2923.24 provide for different penalties for the same conduct, they cannot be construed to give effect to both." *Id.* Further, since both statutes were enacted on the same date, the court determined that under R.C. 1.51, the general law, possession of criminal tools, did not prevail as being the "later adoption." *Id.* at 194. Finally, the supreme court held that "the fact that the General Assembly enacted R.C. 2915.02(A)(5) to reach possession and control of gambling devices indicates that it did not intend for R.C. 2923.24 to reach possession and control of such devices." *Id.*

{¶46} In this case, Barron argues that trafficking in persons is the more general offense and promoting prostitution the more specific offense, which should have taken precedence under R.C. 1.51 and pursuant to *Volpe*. We find that neither R.C. 1.51 nor *Volpe* compel the result Barron urges.

{¶47} R.C. 2905.32(A)(1), trafficking in persons, provides in relevant part:

> No person shall knowingly recruit, lure, entice, isolate, harbor, transport, provide, obtain, or maintain * * * another person if * * * the following applies:
>
> The offender knows that the other person will be * * * compelled to engage in sexual activity for hire * * *.

{¶48} The statute further clarifies that "[f]or a prosecution under division (A)(1) of this section, the element 'compelled' does not require that the compulsion be openly displayed or physically exerted. The element 'compelled' has been established if the state

---

8. R.C. 1.51 provides:

If a general provision conflicts with a special or local provision, they shall be construed, if possible, so that effect is given to both. If the conflict between the provisions is irreconcilable, the special or local provision prevails as an exception to the general provision, unless the general provision is the later adoption and the manifest intent is that the general provision prevail.

proves that the victim's will was overcome by force, fear, duress, intimidation, or fraud." R.C. 2905.32(B).

{¶49} R.C. 2907.22(A)(2), promoting prostitution, states:

No person shall knowingly:

* * *

Supervise, manage, or control the activities of a prostitute in engaging in sexual activity for hire * * *.

{¶50} The offense of trafficking in persons is focused on the actions of a defendant that cause a victim to be "compelled"—through force, fear, duress, intimidation, or fraud— to enter into and then remain in prostitution. For example, in *State v. Warren*, 8th Dist. Cuyahoga No. 102181, 2015-Ohio-3671, the defendant—charged and convicted of trafficking in persons—exercised "pimp control" over his victims. *Id.* at ¶ 7. He instilled fear through beating another girl in front of the victims, taking money and social security benefits from a victim, confiscating the victims' birth certificates, and by mentally and emotionally abusing the victims to the point of complete submission to his control. *Id.* at ¶ 38-40.

{¶51} In *State v. Brown*, 8th Dist. Cuyahoga No. 106582, 2019-Ohio-1235, the Eighth District Court of Appeals found that trafficking in persons involved affirmative actions that "persuade, attract, or enable another" to engage in prostitution, or where a defendant aids "in the act of prostitution, profits from another's prostitution, and exercises some dominion or control over the individual." *Id.* at ¶ 47. There, the victim initially stated she voluntarily engaged in prostitution. *Id.* at ¶ 51. The defendant allowed her to keep half of the money she earned, and the court found this was an enticement that led her to believe that she would be able to provide for herself and her son. However, the defendant subsequently began to keep all the money the victim earned and began maintaining and providing support for the victim and her son. Over the course of several weeks, the victim

became overcome with fear and duress that if she left the defendant, she would not be able to support herself or her son. *Id.*

{¶52} The offense of promoting prostitution, on the other hand, is focused on the regular activities of supervision, management, and control that relate to operating a prostitution business. The Second District Court of Appeals has determined that a defendant's conviction for promoting prostitution was supported by sufficient evidence where the evidence indicated that the defendant created "Backpage" advertisements soliciting johns, posted photographs of the prostitute, and the defendant's phone number was listed as the contact number in the advertisements. *State v. Satterfield*, 2d Dist. Montgomery No. 27180, 2017-Ohio-5616, ¶ 25. When an individual called the phone number, the defendant answered and arranged the "date," which involved negotiating the price, location, duration, and time that the date was to occur. The defendant arranged transportation to and from the date for the prostitute. The defendant rode with the prostitute to the date and waited in the vehicle while the date was occurring. Finally, evidence indicated the defendant expected to receive a share of the profits after the date was completed. *Id.*

{¶53} In this case, there is a distinction between the evidence supporting Barron's convictions for trafficking in persons and promoting prostitution. With regard to trafficking in persons, Amy's testimony established that Barron maintained her prostitution activities using force, fear, duress, and intimidation. Amy testified that Barron "told her to do it," meaning have sex with johns, and that she was aware that if she did not, there would be "consequences." She knew about "consequences" because she had seen Rose suffer "consequences" before she herself began to engage in prostitution for Barron at the Super 8. The consequences included physical assault. Amy also testified that Barron threatened to post photographs of her online, which she did not want because of her children. Barron

also set rules which allowed him to maintain Amy and Rose in a subservient role, which included that they had to be completely nude when they were in his room, and they were not allowed to have passcodes on their phones. Barron periodically let Amy go visit her family but always kept certain personal items to ensure she would return. This included her rings, jewelry, phone, and wallet, which contained identification, credit cards, and her social security card. Amy also testified that Barron forced her to take methamphetamine which resulted in her becoming addicted. And because Barron took all the money resulting from the prostitution activities, Barron maintained Amy in prostitution because she was necessarily reliant on him to provide her with shelter, food, and narcotics.

{¶54} On the other hand, the evidence supporting the offense of promoting prostitution included the numerous exhibits admitted at trial demonstrating how Barron used digital tools (the internet, and text messages) to manage his prostitution business. The evidence indicated that he created online advertisements for sexual services. He took photographs of the women or used their "selfies," which he would forward to his phone. He listed his phone number on advertisements. Barron determined the price for the sexual services and listed the price on the online advertisement as (for example) "qv60hhr100." He rented hotel rooms at the various hotels where Amy and Rose would meet johns for sex. He communicated with the johns, informing them where to meet, and negotiated on the sexual services that would be performed and the price. He instructed Amy on what to say to johns when she was alone with them. He instructed Amy on the rules of dealing with johns, writing in one text message: "Rule number 1 in this game. Never get in a john car thats pulling off." [Sic.] He monitored the time that the johns spent with Amy and Rose and would determine when the john's time was up.

{¶55} Based on the foregoing, we conclude that R.C. 1.51 and *Volpe* did not preclude Barron's convictions for trafficking in persons when he was also convicted of

promoting prostitution. Barron has failed to demonstrate error, much less plain error, in his convictions for both trafficking in persons and promoting prostitution. We therefore overrule Barron's second assignment of error.

{¶56} Assignment of Error No. 3:

{¶57} DEFENDANT MUST BE RE-SENTENCED DUE TO THE FAILURE OF THE TRIAL COURT TO MERGE ALLIED OFFENSES.

{¶58} Barron argues that the trafficking in persons offenses were allied offenses of similar import with the promoting prostitution offenses because "the same conduct which was involved in the supervision and controlling and managing of [Amy] was the same conduct that involved the trafficking allegations." Barron additionally argues that each of the trafficking in persons counts should have merged because the only difference between the counts were that they occurred in different hotels. Finally, Barron argues that all the promoting prostitution counts should merge because they were all based on a continuous course of conduct with one animus and one victim.

**A. Standard of Review**

{¶59} Barron did not request merger at sentencing, or otherwise object to the court's decision to impose sentence on each count of trafficking in persons and promoting prostitution. Accordingly, Barron must demonstrate plain error. *Evick*, 2019-Ohio-2791 at ¶ 24.

**B. Analysis**

{¶60} The trafficking in persons statute relevantly provides:

> A prosecution for a violation of this section does not preclude a prosecution of a violation of any other section of the Revised Code. One or more acts, a series of acts, or a course of behavior that can be prosecuted under this section or any other section of the Revised Code may be prosecuted under this section, the other section of the Revised Code, or both sections. However, if an offender is convicted of or pleads guilty to a violation of this

section and also is convicted of or pleads guilty to a violation of section 2907.21 of the Revised Code based on the same conduct involving the same victim that was the basis of the violation of this section, or is convicted of or pleads guilty to any other violation of Chapter 2907. of the Revised Code *based on the same conduct involving the same victim* that was the basis of the violation of this section, the two offenses are allied offenses of similar import under section 2941.25 of the Revised Code.

(Emphasis added.) R.C. 2905.32(D).

{¶61} Thus, because Barron was also convicted of promoting prostitution in violation of Chapter 2907 of the Revised Code, the question becomes whether Barron's convictions for trafficking in persons and promoting prostitution were based on the same conduct involving the same victim. Additionally, under the allied offense analysis utilized by the Ohio Supreme Court and our court, a defendant may be convicted and sentenced for multiple offenses if: "'(1) the offenses are dissimilar in import or significance – in other words, each offense caused separate, identifiable harm, (2) the offenses were committed separately, and (3) the offenses were committed with separate animus or motivation.'" *State v. Morris*, 12th Dist. Butler No. CA2019-12-205, 2020-Ohio-4103, ¶ 14, quoting *State v. Ruff*, 143 Ohio St.3d 114, 2015-Ohio-995, ¶ 25. "'An affirmative answer to any of the above will permit separate convictions.'" *State v. Robinson*, 12th Dist. Butler No. CA2014-12-256, 2015-Ohio-4649, ¶ 40, quoting *Ruff* at ¶ 31.

{¶62} For the reasons articulated in response to Barron's second assignment of error, we find that Barron's convictions for trafficking in persons and promoting prostitution counts were not based on the same conduct and were dissimilar in import and significance. As discussed above, the evidence supporting the trafficking in persons counts related to Barron's actions in maintaining Amy in prostitution through compulsory acts of force, threats, and fear. The promoting prostitution counts were established through other evidence that exemplified the management of a prostitution enterprise, including creating

advertisements, setting prices, securing places to engage in prostitution activities, communicating and negotiating with johns, and managing time with johns. Each offense also caused separate, identifiable harm. Trafficking in persons attempts to proscribe harm to the prostitute who is forced, against her will, to remain in prostitution. On the other hand, promoting prostitution attempts to curtail the general harm caused by the operation of a prostitution business.

{¶63} With regard to the three trafficking in persons counts, we do not find that Barron has established plain error in the court's failure to merge those counts. We find that each of those offenses caused separate, identifiable harm and were committed separately. Count 1 involved trafficking in persons that occurred between March 10, 2020 through April 9, 2020. The evidence at trial indicated that Barron's trafficking activities during this time occurred primarily at the Super 8. Count 3 involved trafficking in persons that occurred between April 9, 2020 through April 23, 2020, and which the evidence at trial indicated occurred at the Red Roof Inn. Finally, Count 5 involved trafficking occurring between April 23, 2020 through May 2, 2020 and involved trafficking that occurred largely at the Baymont Inn and may also have included some trafficking activities occurring at the nearby Super 8.

{¶64} That these offenses occurred at distinct locations and times is sufficient to show that they were committed separately. Barron did not limit his trafficking activities to merely one hotel, but spread those activities, and the resulting harms, to three separate hotels. The separate locations where Barron committed his trafficking offenses are significant and sufficient to demonstrate that the offenses were dissimilar in import or significance. *See State v. Gomez*, 10th Dist. Franklin No. 16AP-560, 2017-Ohio-8832, ¶ 25 (finding no plain error in the trial court's failure to merge five trafficking counts involving different quantities of the same type of drug recovered on the same day at five different locations); *State v. Hymes*, 7th Dist. Mahoning No. 19 MA 0130, 2021-Ohio-3439, ¶ 105

(declining to merge felonious assault and murder offenses where the victim was assaulted two different times in two different locations); *State v. Williams*, 5th Dist. Licking No. 11-CA-115, 2012-Ohio-3211, ¶ 20 (rejecting merger argument for drug offenses where the act of selling or offering was separated in time and space from the possession of different narcotics in a different bag in a different location).

{¶65} The same reasoning set forth above would also establish that the sentencing court was not required to merge the promoting prostitution counts. Like the trafficking in persons counts, each count of promoting prostitution involved distinct time periods corresponding to prostitution activities occurring at distinct locations. Each count was committed separately and caused distinct and identifiable harm at all three locations.

{¶66} Finally, we note that Barron must demonstrate an error which is "fundamental, palpable, and obvious" on the face of the record such that it should have been obvious to the sentencing court that the offense should have merged. *Barnette*, 2013-Ohio-990 at ¶ 30. Based on the analysis set forth above, it is not "fundamental, obvious, or palpable" that the challenged offenses should have merged. We overrule Barron's third assignment of error.

{¶67} Assignment of Error No. 4:

{¶68} BARRON'S CONVICTIONS AND SENTENCE MUST BE REVERSED BECAUSE HE DID NOT RECEIVE EFFECTIVE ASSISTANCE OF COUNSEL.

{¶69} Barron argues that he received constitutionally defective assistance of counsel where his attorney failed to strike a potentially biased juror during jury selection. He further argues that his counsel was deficient for failing to object to the court's sentence based on an allied offense argument, as set forth in the preceding assignment of error.

**A. Standard of Review**

{¶70} To prevail on an ineffective assistance of counsel claim, Barron must establish (1) deficient performance by trial counsel, that is, performance falling below an objective standard of reasonable representation, and (2) prejudice, that is, a reasonable probability that but for counsel's errors, the result of the proceedings would have been different. *State v. Taylor*, 12th Dist. Fayette No. CA2018-11-021, 2019-Ohio-3437, ¶ 16, citing *Strickland v. Washington*, 466 U.S. 668, 687-688, 694, 104 S.Ct. 2052 (1984) and *State v. Mundt*, 115 Ohio St.3d 22, 2007-Ohio-4836, ¶ 62. The failure to demonstrate either prong is fatal to an ineffective assistance of counsel claim. *State v. Kaufhold*, 12th Dist. Butler No. CA2019-09-148, 2020-Ohio-3835, ¶ 54. In considering an ineffective assistance claim, an "appellate court must give wide deference to the strategic and tactical choices made by trial counsel in determining whether counsel's performance was constitutionally ineffective." *State v. McLaughlin*, 12th Dist. Clinton No. CA2019-02-002, 2020-Ohio-969, ¶ 54.

### B. Failure to Strike Allegedly Biased Juror

{¶71} Barron contends that trial counsel provided ineffective assistance by failing to strike a juror who expressed concerns about being a fair and impartial juror.

{¶72} A touchstone of a fair trial is an impartial trier of fact, that is, a jury capable and willing to decide the case solely on the evidence before it. *State v. Bates*, 159 Ohio St.3d 156, 2020-Ohio-634, ¶ 30, citing *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 554, 104 S.Ct. 845 (1984). Jury selection is the primary means by which a court may enforce a defendant's right to be tried by a jury free from any negative predisposition about the defendant. *Id.*, citing *Gomez v. United States*, 490 U.S. 858, 873, 109 S.Ct. 2237 (1989). A trial court must engage in an adequate voir dire in order to remove prospective jurors who will not be able to impartially follow the court's instructions and evaluate the evidence. *Id.*, citing *Rosales-Lopez v. United States*, 451 U.S. 182, 188, 101 S.Ct. 1629 (1981).

{¶73} To maintain a claim that a biased juror prejudiced him, a defendant must show that the juror was actually biased against him. *Id.* at ¶ 25. "Actual bias can be revealed through a prospective juror's express admission, but 'more frequently, jurors are reluctant to admit actual bias' and it must be exposed through circumstantial evidence." *Id.*, citing *Miller v. Webb*, 385 F.3d 666, 673 (6th Cir.2004). The Ohio Supreme Court has consistently declined to second-guess trial strategy decisions or impose hindsight views about how counsel might have voir dired the jury differently. *State v. Wallace*, 12th Dist. Brown Nos. CA2017-09-011 and CA2017-11-014, 2019-Ohio-442, ¶ 56, citing *State v. Pickens*, 141 Ohio St.3d 462, 2014-Ohio-5445, ¶ 205 (overruled on other grounds.). "[C]ounsel is in the best position to determine whether any potential juror should be questioned and to what extent." *State v. Murphy*, 91 Ohio St.3d 516, 539 (2001).

{¶74} During voir dire, the court asked the juror in question whether there was anything he would like to share with the court or attorneys as far as whether he could decide the case fairly and impartially. The following exchange then occurred:

> **The juror:** Judge, I was excited about being on a jury for the very first time; however, I look at let's say our community in a respect that we don't have enough police officers on the street. I don't think that the State is going to bring a case that they must have been investigating for months unless it was a really strong case. So I come in with an implicit bias that the defendant is probably 90 percent guilty. That's a bias that I have, I just wanted to be honest.
>
> **The court:** Okay. It's not that unusual. It's why we have this part of the trial. And if you were on trial in another part of the country, for example, other than where you grew up, what would you expect from a juror? Would you expect that your mindset would be that of a fair juror?
>
> **The juror:** Of course. However, I'm 63 years old and I've lived my life by trying to avoid things that would get me into trouble and engage police contact. Therefore, I can't ever envision myself being in that situation.
>
> **The court:** Okay. But I'm trying to make sure that you would be

- 22 -

– if you were on trial for something, if you have been accused of something and let's just remember we're talking about a person who's presumed innocent. By law he's presumed innocent. Would you trust yourself on that jury?

**The juror:** Yes.

**The court:** Okay. Any other reason you couldn't serve? You remember when I was asking at the beginning if there's anything going on at home, sick parent, anything like that?

**The juror:** No, sir.

{¶75} Later in the voir dire, defense counsel had several direct exchanges with the juror:

> **Defense counsel:** * * * Every one of you who is chosen is going to be the judge of the facts. Do you understand that? * * * [indicating the juror], how about you?
>
> **The juror:** That's the way I would view the question. I'm going to examine the evidence – examine the evidence and based on the judge's instructions determine guilt or innocence. I will be responsible for determining the credibility of any of the witnesses that are presented.
>
> * * *
>
> **Defense counsel:** Alternatively, in the event that none of you are convinced, can you also agree that if you're not convinced that you won't sign a guilty verdict? [indicating the juror] –
>
> **The juror:** Yes, sir.
>
> **Defense counsel:** If you're not firmly convinced of the truth of the charge, can you say nope, I'm going to find not guilty?
>
> **The juror:** Yes, sir.
>
> * * *
>
> **Defense counsel:** [Asks jurors questions about whether they watch shows like Better Call Saul and whether they believe that all defense attorneys are "shady."]
>
> **The juror:** I don't watch those shows, but I'm going to weigh the evidence and take the judge's instructions and discuss it with the jury.

\* \* \*

> **Defense counsel:** All right. Is there anybody who absolutely has to hear Mr. Barron testify in order for them to make a decision on this case? [indicating the juror].
>
> **The juror:** No, sir.

{¶76} In addition, defense counsel interviewed the jurors at length in a group questioning format. All jurors agreed that they would remain fair and impartial and follow the court's instructions. All jurors agreed that Barron was entitled to the presumption of innocence and that it was the state's job to prove him guilty beyond a reasonable doubt.

{¶77} The juror in question honestly revealed a bias that was, as noted by the trial court, not unusual. However, the juror repeatedly assured the court and the parties of his ability to remain impartial, to follow the court's instructions, and to fairly decide the case. The juror's responses also indicate that he understood his role as a juror, the presumption of innocence, and the state's burden of proof. Thus, through additional questioning both individually and in group session, it appears that the juror was successfully rehabilitated. *See Wallace*, 2019-Ohio-442 at ¶ 58-61 (holding that counsel was not ineffective for failing to challenge jurors for cause after certain allegedly biased jurors were rehabilitated through additional questioning by the court).

{¶78} Additionally, one of the juror's other responses indicated a potential strategic reason defense counsel may have wanted the juror to remain. Specifically, the juror's comment in response to a question about the "#MeToo movement" revealed a level of skepticism about the movement and questioned whether an accuser might have something to gain by going public. Thus, Barron's trial counsel's decision to keep the juror could have been within the ambit of trial strategy. *State v. Thompson*, 141 Ohio St.3d 254, 2014-Ohio-4751, ¶ 225, 227 (observing that few decisions at trial are as prone to individual attorney

strategy as voir dire and that trial counsel are in the best position to determine whether a juror can be rehabilitated as they have personally observed the juror's demeanor and statements.).

{¶79} Barron cites a recent Ohio Supreme Court case for the proposition that the failure to strike a juror who admitted bias constitutes ineffective assistance of counsel. *Bates*, 2020-Ohio-634. That case, however, is readily distinguishable. The defendant in that case was black, and a Caucasian juror revealed a blatant racial bias against black people in her jury questionnaire. *Id.* at ¶ 27. Neither the court nor the parties ever questioned the juror concerning her admitted racial bias, but she was nonetheless empaneled. *Id.* at ¶ 29. The court held that defense counsel's failure to question the juror about her questionnaire was objectively unreasonable attorney performance under *Strickland* and the juror's statements demonstrated actual bias and thus prejudice. *Id.* at ¶ 32, 37. In the case before us, however, the juror was extensively questioned about his potential bias, and through this questioning the juror was rehabilitated. Consequently, we do not find that Barron has demonstrated that his counsel provided deficient performance for failing to strike the juror, nor does the record indicate that the juror harbored actual bias against Barron.

### C. Failure to Object/Argue for Merger

{¶80} Baron next argues that if this court overrules the allied offense arguments set forth in the preceding assignment of error, then his counsel performed deficiently for failing to argue merger in the proceedings below. For the reasons discussed in the previous assignment of error, we find no error, plain or otherwise, in the failure to merge the offenses, as they were not allied offenses of similar import. Therefore, trial counsel was not ineffective in failing to raise this issue.

{¶81} For the foregoing reasons, we overrule Barron's fourth assignment of error.

{¶82} Assignment of Error No. 5:

{¶83} BARRON'S SENTENCE WAS UNCONSTITUTIONAL.

{¶84} Barron next argues that his sentence under the Reagan Tokes Act was unconstitutional because it violates the separation-of-powers doctrine. Barron concedes that this court has already addressed this specific argument and rejected it, finding the Reagan Tokes Act to be constitutional. *State v. Suder*, 12th Dist. Clermont Nos. CA2020-06-034 and CA2020-06-035, 2021-Ohio-465, ¶ 24-25. However, Barron explains that he assigns error to preserve the record in the event of a contrary decision by the Ohio Supreme Court.

{¶85} The record shows that Barron never raised this issue with the trial court. It is well established that the question of the constitutionality of a statute must be raised at the first opportunity, and, in a criminal prosecution, this means in the trial court. *State v. Buttery*, 162 Ohio St.3d 10, 2020-Ohio-2998, ¶ 7. Consequently, by not first raising the issue with the trial court, Barron's arguments challenging the constitutionality of R.C 2967.271 are forfeited and will not be heard for the first time on appeal. *State v. Hodgkin*, 12th Dist. Warren No. CA2020-08-048, 2021-Ohio-1353, ¶ 11; *State v. Teasley,* 12th Dist. Butler No. CA2020-01-001, 2020-Ohio-4626, ¶ 9; and *State v. Alexander*, 12th Dist. Butler No. CA2019-12-204, 2020-Ohio-3838, ¶ 8 (appellant's failure to challenge the constitutionality of the Reagan Tokes Law forfeited the right to challenge its constitutionality on appeal). We overrule Barron's fifth assignment of error.

{¶86} Assignment of Error No. 6:

{¶87} THE FELONIOUS ASSAULT CONVICTION AGAINST [ROSE] WAS NOT SUPPORTED BY SUFFICIENT EVIDENCE.

{¶88} Barron argues that the state presented legally insufficient evidence to allow a reasonable factfinder to convict him of felonious assault because of a lack of evidence that

Rose suffered serious physical harm. When reviewing the sufficiency of the evidence underlying a conviction, an appellate court examines the evidence to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. *State v. Paul*, 12th Dist. Fayette No. CA2011-10-026, 2012-Ohio-3205, ¶ 9. Therefore, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus.

{¶89} The jury found Barron guilty of felonious assault, a violation of R.C. 2903.11(A)(1), which prohibits causing "serious physical harm" to another. The Revised Code defines "serious physical harm," in relevant part, as "[a]ny physical harm that involves some permanent incapacity, whether partial or total, or that involves some temporary, substantial incapacity * * *." R.C. 2901.01(A)(5)(c).

{¶90} Amy testified that on one occasion, Rose woke up "dope sick" and locked herself in a bathroom, angering Barron. When she emerged from the bathroom, Barron began hitting her "everywhere." He threw an iron at her and dumped a gallon of milk on her. She started to cry and he told her to stop. She then tried to leave the room and he then "smacked her and knocked her out." Amy confirmed that Rose was "out" after the blow.

{¶91} We find that these facts constitute sufficient evidence of serious physical harm under R.C. 2903.11(A)(1). By rendering Rose unconscious, Barron caused physical harm that involved some "temporary, substantial incapacity." R.C. 2901.01(A)(5)(c). "Being rendered unconscious, no matter how brief, qualifie[s] as a 'temporary substantial incapacity,' which satisfie[s] the serious physical harm requirement." *State v. Spaulding*, 6th Dist. Sandusky No. S-16-028, 2017-Ohio-7993, ¶ 13. *Accord State v. McSwain*, 8th

Dist. Cuyahoga No. 83394, 2004-Ohio-3292, ¶ 29 ("Unconsciousness is a state of temporary, substantial incapacity sufficient to constitute serious physical harm."); *State v. Wimpey*, 6th Dist. Lucas No. L-18-1262, 2019-Ohio-4823, ¶ 23.

{¶92} Barron also argues that the evidence was insufficient to establish that he "knowingly" caused Rose serious physical harm because the evidence indicated that he struck her with an open-handed slap. "A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature." R.C. 2901.22(B).

{¶93} Barron posits that he could not have expected a slap to cause Rose serious physical harm. This argument is meritless. Amy testified that upon rendering Rose unconscious, Barron stated, "that's how you make a bitch shut up." Thus, the evidence, if believed, would support the conclusion that Barron struck Rose with sufficient force so that she would stop crying. The evidence was sufficient to show that Barron was aware that his conduct would cause Rose serious physical harm. We overrule Barron's sixth assignment of error.

{¶94} Assignment of Error No. 7:

{¶95} BARRON'S CONVICTIONS WERE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶96} In his final assignment of error, Barron argues that all his convictions were against the manifest weight of the evidence because Amy was not a credible witness. A manifest weight of the evidence challenge examines the "inclination of the greater amount of credible evidence, offered at a trial, to support one side of the issue rather than the other." *State v. Barnett*, 12th Dist. Butler No. CA2011-09-177, 2012-Ohio-2372, ¶ 14. To determine whether a conviction is against the manifest weight of the evidence, the reviewing court must look at the entire record, weigh the evidence and all reasonable inferences, consider

the credibility of the witnesses, and determine whether in resolving the conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed, and a new trial ordered. *State v. Graham*, 12th Dist. Warren No. CA2008-07-095, 2009-Ohio-2814, ¶ 66.

{¶97} In reviewing the evidence, an appellate court must be mindful that the original trier of fact was in the best position to judge the credibility of witnesses and determine the weight to be given to the evidence. *State v. Blankenburg*, 197 Ohio App.3d 201, 2012-Ohio-1289, ¶ 114 (12th Dist.). An appellate court will overturn a conviction due to the manifest weight of the evidence only in the exceptional case in which the evidence weighs heavily against the conviction. *State v. Zitney*, 12th Dist. Clinton No. CA2020-06-007, 2021-Ohio-466, ¶ 15.

{¶98} Barron argues that Amy lacked credibility because she had multiple warrants for her arrest at the time of her trial testimony, which warrants had been "suspended" by the Warren County prosecutor's office so that she could testify. Barron further argues that her explanation for how she became entangled and eventually under Barron's control made no sense. Barron further points out that at the time Amy was engaging in prostitution for Barron, she was able to leave Barron and visit her family.

{¶99} We do not find that Barron's convictions were against the manifest weight of the evidence in light of Amy's credibility. All the issues with Amy's credibility that Barron cites were laid in front of the jury. With respect to the warrants, Amy explained that the warrants were only suspended temporarily and that she still had to face charges on those warrants.

{¶100} Amy was thoroughly cross-examined on all the remaining arguments Barron makes, including how and why she became involved in prostitution with Barron. The jury was free to assign whatever weight it determined appropriate in assessing the truthfulness

of Amy's testimony.  Clearly, the jury believed Amy's testimony, which was corroborated by other evidence uncovered by police.  For instance, consistent with Amy's claims that Barron would keep her personal items to ensure that she would return to him, a police officer searching one of the hotel rooms located Amy's wallet in a drawer, which wallet contained her identification card, social security card, and credit cards.  The officer further located two rings.  In addition, Amy's testimony about how Barron ran his prostitution business was corroborated by the substantial evidence retrieved from Barron's cell phone.  This is not the exceptional case where the evidence weighed heavily in favor of an acquittal.  We overrule Barron's seventh assignment of error.

{¶101} Judgment affirmed.

PIPER, P.J., and HENDRICKSON, J., concur.