[Cite as *State v. Satterfield*, 2017-Ohio-5616.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY**

STATE OF OHIO
          Plaintiff-Appellee

v.

JENNIFER R. SATTERFIELD

          Defendant-Appellant

:
:
:
:
:
:
:
:
:
:
:

C.A. CASE NO.  27180

T.C. NO. 15-CR-2725/1

(Criminal Appeal from
 Common Pleas Court)

. . . . . . . . . . .

**O P I N I O N**

Rendered on the    30th    day of     June   , 2017.

. . . . . . . . . . .

HEATHER N. JANS, Atty. Reg. No. 0084470, Assistant Prosecuting Attorney, 301 W. Third Street, 5th Floor, Dayton, Ohio 45422
      Attorney for Plaintiff-Appellee

ADELINA E. HAMILTON, Atty. Reg. No. 0078595, Assistant Public Defender, 117 S. Main Street, Suite 400, Dayton, Ohio 45422
      Attorney for Defendant-Appellant

. . . . . . . . . . . .

DONOVAN, J.

{¶ 1} Defendant-appellant Jennifer R. Satterfield appeals her conviction and sentence for one count of promoting prostitution, in violation of R.C. 2907.22(A)(2), a felony of the fourth degree; and one count of possession of criminal tools, in violation of R.C. 2923.24(A), a felony of the fifth degree. Jennifer filed a timely notice of appeal on

July 13, 2016.

{¶ 2} In July of 2015, Detective John Howard of the Dayton Police Department was assigned to the street crimes unit of the City of Dayton Narcotics Bureau. As part of his duties, Det. Howard investigated prostitution and human trafficking related offenses. Det. Howard testified that he has been employed by the Dayton Police Department for approximately ten years, and during that time he has made approximately 300 prostitution related arrests.

{¶ 3} In July of 2015, Det. Howard's street crimes unit participated with several other law enforcement agencies in the Regional Sexual Traffic Operation Response Movement (R-STORM). R-STORM was a month long operation designed to combat prostitution and human trafficking in Dayton and nearby areas. As part of R-STORM, authorities began using a house located on Vine Street in Dayton, Ohio, as an undercover decoy location. The decoy house contained hidden audio and video equipment used to record prostitution and/or human trafficking related offenses. The operation was being used to target specific advertisements under the "Escort" section of a website known as Backpage, which was known by police to be used for prostitution related purposes. One of the primary purposes of Det. Howard's street crimes unit was to monitor the "Escort" section of Backpage on an almost daily basis and respond to advertisements which were believed to be utilized in the solicitation of prostitutes.

{¶ 4} On July 16, 2015, Det. Howard responded to a Backpage advertisement as part of his duties with R-STORM. Det. Howard testified that he observed that the advertisement had been posted online and removed several times. Therefore, there were actually three advertisements involving the same female suspect that Det. Howard

contacted. Each of the three advertisements stated that the female suspect, who identified herself as "Jenna," was available for "out call," which means that the prostitute will travel to the location of the individual responding to the advertisement. The email account used to post each of the three advertisements contained the defendant's last name.

{¶ 5} Det. Howard testified that he recognized "Jenna" from the advertisements as a woman named Angel Satterfield, whom he knew from prior prostitution investigations. Angel is a cousin of the defendant-appellant, Jennifer Satterfield. Det. Howard testified that he was also familiar with Jennifer through other prostitution investigations as she had been convicted of solicitation in the past. During this time, Jennifer also used the name "Jazzy."

{¶ 6} At approximately 11:30 a.m. on July 16, 2015, Det. Howard, posing as potential client, responded to the advertisements featuring photographs of Angel via text message. Detective Howard contacted the phone number provided in the advertisements. An individual responded to Det. Howard also by text message, and arrangements were made between the parties for a thirty minute "date" at approximately 2:00 p.m. that same day in exchange for $100.00. A "date" is the term used to mean a sexual encounter for hire.

{¶ 7} At approximately 1:30 p.m., Det. Howard called the advertised phone number and briefly spoke with a female later identified as Jennifer. During a second phone conversation shortly thereafter, Jennifer informed Det. Howard that the female in the advertisement photographs did not want to come and was therefore, unavailable. During the second conversation, Jennifer also informed Det. Howard that she posted the

advertisements and arranged the appointments for the female depicted in the photographs, Angel. At one point during the conversation, Jennifer, identifying herself as "Jazzy," even offered to come to the "date" in Angel's place. Det. Howard, however, repeated his request for Angel, and Jennifer informed him that "she would send Angel." Jennifer even put Angel on the telephone during the second call in order to reassure Det. Howard that she was the female depicted in the photographs and that she was the one coming to see him. Angel then handed the telephone back to Jennifer who thereafter concluded the conversation with Det. Howard.

{¶ 8} At approximately 2:00 p.m., Det. Howard attempted to cancel his "date" with Angel via text message because the decoy house was being used at the time for another prostitution investigation. Det. Howard thereafter received several text messages from "Jazzy" in which she stated that she was already on her way to his house and had Angel with her pursuant to their earlier agreement. At approximately 2:21 p.m., Det. Howard received a final text message from "Jazzy" in which she stated "so, baby, see her. Enjoy yourself. Okay, Think I." At that point, Angel walked up to the front door of the decoy house and knocked. Det. Howard opened the door, let Angel inside, and engaged her in conversation that was being recorded in audio and visual format.

{¶ 9} Once Angel was inside the decoy house, Det. Howard gave her $100.00, and he asked her what sexual acts she was willing to perform. Angel informed Det. Howard that she was willing to provide "full service," that is, vaginal, oral, and/or anal sex to "completion," meaning ejaculation. Angel also informed Det. Howard that a client usually provided his own condoms during the sexual encounter. At that point, several other police officers entered the room and placed Angel under arrest for solicitation. The

officers then went outside and arrested a woman named Mary Bernard, the owner and driver of the vehicle that transported Angel to the decoy house, as well as Jennifer, who was sitting in the front passenger seat of the vehicle. Bernard's vehicle was parked across the street from the decoy house.

{¶ 10} After she was arrested, Jennifer was *Mirandized* by Detective Greg Orick of the Dayton Police Department. Det. Howard testified that Jennifer agreed to speak with him without an attorney present. Thereafter, Jennifer admitted that she designed and posted the advertisements featuring Angel that Det. Howard had viewed earlier that day. Jennifer also stated that she was the individual who initially spoke to Det. Howard on the telephone and arranged the "date" with Angel. Jennifer further admitted that she arranged for the ride with Mary Bernard and agreed to pay her $25.00 in order to transport Angel to the decoy house for her "date" with Det. Howard.

{¶ 11} Additionally, Det. Orick recovered a cellular phone from Jennifer which was later analyzed pursuant to a search warrant. The number for the cell phone was found to be the same number Det. Howard called and sent texts to in order to arrange the "date" with Angel. The cell phone contained several photographs of Angel that were used in the Backpage advertisements to which Det. Howard responded. Upon further investigation, the cell phone was also found to contain texts from Jennifer asking Mary Bernard to give her and Angel a ride to the decoy house for a payment of $25.00. Later texts found in the phone establish that Mary Bernard agreed to give Jennifer a ride.

{¶ 12} On December 31, 2015, Jennifer was indicted for one count of promoting prostitution and one count of possession of criminal tools. At her arraignment on January 19, 2016, Jennifer stood mute, and the trial court entered a plea of not guilty on

her behalf.

{¶ 13} Thereafter, a bench trial was held over two days, April 15 and April 25, 2016, after which the parties were permitted to file post-trial memoranda in support of their respective positions. On June 3, 2016, the trial court found Jennifer guilty of promoting prostitution and possession of criminal tools. On July 7, 2016, the trial court sentenced Jennifer to community control sanctions not to exceed five years. Jennifer was also designated a Tier I sex-offender with a duty to report for fifteen years.

{¶ 14} It is from this judgment that Jennifer now appeals.

{¶ 15} Jennifer's first assignment of error is as follows:

{¶ 16} "THE JUDGMENT OF CONVICTION AGAINST THE DEFENDANT-APPELLANT FOR PROMOTING PROSTITUTION SHOULD BE REVERSED BECAUSE IT IS BASED ON LEGALLY INSUFFICIENT EVIDENCE AS A MATTER OF LAW."

{¶ 17} In her first assignment, Jennifer contends that the evidence adduced by the State was insufficient to support her conviction for promoting prostitution. Jennifer argues that the State failed to prove that she "supervised, managed, or controlled" Angel's prostitution activities. Specifically, Jennifer asserts that the offense of promoting prostitution can only be directed towards an actual business enterprise, and the elements of "supervision, management, or control" require that the defendant exercise power, influence, and dominance over the individual engaged in the sex for hire.

{¶ 18} "A sufficiency of the evidence argument disputes whether the State has presented adequate evidence on each element of the offense to allow the case to go to the jury or sustain the verdict as a matter of law." *State v. Wilson*, 2d Dist. Montgomery

No. 22581, 2009-Ohio-525, ¶ 10, citing *State v. Thompkins*, 78 Ohio St.3d 380, 678 N.E.2d 541 (1997). In such situations, we apply the test from *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), which states that:

> An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.

(Citation omitted). *Id.* at paragraph two of the syllabus.

{¶ 19} R.C. 2907.22(A)(2) provides, "No person shall knowingly: * * * (2) Supervise, manage, or control the activities of a prostitute engaging in sexual activity for hire." "A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when the person is aware that such circumstances probably exist." R.C. 2901.22(B). R.C. 2907.22 does not define "supervise, manage, or control."

{¶ 20} Black's Law Dictionary defines "supervise" in part as follows: "[t]o have general oversight over * * *." *Id.,* 1290 (5th Ed. 1979). "Manage" is defined in pertinent part as follows: "[t]o control and direct, to administer, to take charge of." *Id.* at 865. Lastly, Black's Law Dictionary defines "control" as the "power or authority to manage, direct, superintend, restrict, regulate, govern, administer, or oversee." *Id.* at 298.

{¶ 21} In *State v. McGlothin,* 2d Dist. Montgomery No. 14687, 1995 WL 461271, *2 (Aug. 2, 1995), we stated the following:

The plain language of R.C. 2907.22(A)(2) indicates that the actions which form the basis of the offense are supervision, management, or control. In our view, the statute does not require that the prostitute complete a sexual act in order for the "supervisor" to have committed the offense. *All that is necessary is that the supervision, management, or control of the prostitute's activities was for the purpose of the prostitute's providing sexual activity for hire.*

Obviously, the supervision, management, or control required by the statute is not limited in time or scope to the sexual activity itself. It may begin with making assignments and giving instructions, and continue through the time that the prostitute completes an assignment and concludes financial arrangements with the "supervisor." Likewise, "the activities of a prostitute in engaging in sexual activity for hire" are not limited to the actual sexual activity itself. Those activities may consist of activities that both precede and follow the actual sexual activity. Here, for example, [the prostitute] solicited money from [the undercover detective], pursuant to her conversation with McGlothin. While the solicitation of money is not itself sexual activity, it is an activity of a prostitute in engaging in sexual activity for hire.

See *State v. Dukes*, 2015-Ohio-4714, 49 N.E.3d 840, ¶ 9 (2d Dist.); *see also State v. Crew,* 2d Dist. Clark No. 2009 CA 45, 2010-Ohio-3110.

{¶ 22} In the instant case, the evidence adduced at trial established that Jennifer posted the Backpage advertisements containing several photographs of Angel wearing provocative clothing while posing in a sexually suggestive manner. The advertisements created and posted by Jennifer contain language clearly designed to solicit individuals to call and arrange a "date" with Angel in order to have sex for hire. The contact number listed in the advertisements is Jennifer's phone number. When she was contacted by Det. Howard, Jennifer arranged for Angel to meet him for a "full-service" half-hour date in exchange for $100.00. During her conversation with Det. Howard, Jennifer established the price, location, duration, and time that the "date" was to occur. Additionally, the evidence established that Jennifer arranged with Mary Bernard for transport to and from the decoy house in exchange for $25.00. After obtaining transport, Jennifer rode in the car with Angel to the decoy house and waited with Mary Bernard while the "date" was set to occur. When they arrived at the decoy house, Jennifer sent Angel in and sent Det. Howard one final text stating "So, baby, see her. Enjoy yourself. ***" After being taken into custody, Angel informed Det. Howard that Jennifer expected to share in the profits from the "date."

{¶ 23} We also note that Angel testified that she had been living with Jennifer "off and on, since [her] mother passed in '09." Angel further testified that she did not have a cell phone, so she had to use Jennifer's cell phone. Additionally, Angel did not have a driver's license, so she relied upon Jennifer for transportation. Angel also testified that she was addicted to heroin at the time Jennifer arranged the "date" with Det. Howard. The evidence adduced by the State established that Angel was dependent upon Jennifer for housing, transportation, and telephonic communication.

{¶ 24} Recently, in *State v. Dukes,* 2015-Ohio-4714, 49 N.E.3d 840, ¶ 9 (2d Dist.), we affirmed the conviction of a defendant for promoting prostitution after she merely drove another individual from an Englewood motel room to a Dayton-area apartment for the purpose of engaging in sex for hire. Similarly, the defendant in *Dukes* waited in the car while the other individual went inside to complete the "date."

{¶ 25} Viewing the evidence in a light most favorable to the State, we conclude that it is sufficient to support Jennifer's conviction for promoting prostitution. As we have noted, evidence was adduced which established that Jennifer created the Backpage advertisements and posted the photographs of Angel wherein she offered to engage in sex for hire. Jennifer used her phone number as the contact number in the advertisements. When an individual called her phone number, Jennifer arranged the "date" for Angel, negotiating the price, location, duration, and time that the "date" was to occur. Similar to the defendant in *Dukes*, Jennifer arranged transportation to and from the "date" for Angel. Jennifer also rode with Angel to the "date" and waited in the vehicle while it was occurring. Finally, Jennifer expected to receive a share of the profits after the "date" was completed.

{¶ 26} Contrary to Jennifer's assertion, there is nothing in R.C. 2907.22(A)(2) which suggests that it only applies to business enterprises. In fact, the statute clearly provides that "*No person shall* knowingly: * * * (2) Supervise, manage, or control the activities of a prostitute engaging in sexual activity for hire." (Emphasis added). Furthermore, prostitution is by definition a business enterprise, albeit an illegal one. Jennifer posted the advertisements, arranged the "date," negotiated the time, duration, and price of the "date," and arranged for transportation to and from the decoy house in

exchange for a share of the profits. Accordingly, the evidence adduced by the State is sufficient to establish that Jennifer supervised or managed the activities of a prostitute pursuant to R.C. 2907.22(A)(2).

**{¶ 27}** Jennifer's first assignment of error is overruled.

**{¶ 28}** Jennifer's second and final assignment of error is as follows:

**{¶ 29}** "THE OFFENSE OF PROMOTING PROSTITUTION PURSUANT TO R.C. 2907.22(A)(2) IS A GENERAL OFFENSE AND THE OFFENSE OF PROCURING A PROSTITUTE UNDER R.C. 2907.23(A)(1) OR (A)(2) IS A MORE SPECIFIC OFFENSE, THUS WARRANTING A REVERSAL OF THE CONVICTION FOR PROMOTING PROSTITUTION."

**{¶ 30}** In her final assignment, Jennifer argues that her conviction for promoting prostitution, in violation of R.C. 2907.22(A)(2), should be reversed because it is a general offense rather than the "more specific offense" of procuring prostitution pursuant to R.C. 2907.23(A)(1). Initially, we note that Jennifer failed to argue in the proceedings before the trial court that she should have been charged with procuring prostitution rather than promoting prostitution. Jennifer argued in her post-trial memorandum that "the State proved at trial *** that Satterfield *aided and abetted* Angel in her activities as a prostitute on July 16, 2015," in violation of R.C. 2907.25 and 2923.03(A). The record establishes that at no time did Jennifer argue to the trial court that her conviction for R.C. 2907.22(A)(2) should be vacated or dismissed because it is a general offense rather than the "more specific offense" of procuring prostitution pursuant to R.C. 2907.23(A)(1) or (2).

**{¶ 31}** Jennifer has therefore waived all error except plain error. *State v. DeWitt,* 2d Dist. Montgomery No. 24437, 2012–Ohio–635, ¶ 28. To prevail under the plain error

standard, an appellant must demonstrate both that there was an obvious error in the proceedings and that but for the error, the outcome of the trial clearly would have been otherwise. *State v. Noling,* 98 Ohio St.3d 44, 2002–Ohio–7044, 781 N.E.2d 88, ¶¶ 61, 62.

{¶ 32} In *State v. Volpe*, 38 Ohio St.3d 191, 527 N.E.2d 818 (1988), the Supreme Court of Ohio held that, where "there is no manifest legislative intent that a general provision of the Revised Code prevail over a special provision, the special provision takes precedence." *Id.,* at syllabus. The defendants therein were charged with gambling, in violation of R.C. 2915.02, a misdemeanor of the first degree, and possession of criminal tools, in violation of R.C. 2923.24, a felony of the fourth degree. *Id.* at 192. R.C. 2915.02 proscribes possession of gambling devices, while R.C. 2923.24 proscribes possession of criminal tools. Relying upon R.C. 1.51, the Supreme Court determined that the statutes were irreconcilable. *Volpe* at 193. The Court reasoned that, "since R.C. 2915.02 and 2923.24 provide for different penalties for the same conduct, they cannot be construed to give effect to both." *Id.* Further, since both statutes were enacted on the same date, the Court determined that, "under R.C. 1.51, the general law, R.C. 2923.24, does not prevail as being the 'later adoption.' " *Id.,* at 194. Finally, the Court concluded that "the fact that the General Assembly enacted R.C. 2915.02(A)(5) to reach possession and control of gambling devices indicates that it did not intend for R.C. 2923.24 to reach possession and control of such devices." *Id.*

{¶ 33} Unlike the statues at issue in *Volpe,* we conclude that R.C. 2907.22(A)(2) and R.C. 2907.23(A)(1) do not provide different penalties for the same conduct, and they can accordingly be construed to give effect to both statutes. In other words, the statues are not irreconcilable, and analysis pursuant to R.C. 1.51 is not required.

{¶ 34} As previously stated, R.C. 2907.22(A)(2), promoting prostitution, provides in pertinent part:

No person shall knowingly: * * * (2) Supervise, manage, or control the activities of a prostitute engaging in sexual activity for hire.

{¶ 35} On the other hand, R.C. 2907.23(A)(1), procuring prostitution, states as follows:

(A) No person, knowingly and for gain, shall do either of the following:

(1) Entice or solicit another to patronize a prostitute or brothel;

(2) Procure a prostitute for another to patronize, or take or direct another at the other's request to any place for the purpose of patronizing a prostitute.

***

(C) Whoever violates this section is guilty of procuring. Except as otherwise provided in this division, procuring is a misdemeanor of the first degree.

{¶ 36} In *State v. Marcel-Rene*, 9th Dist. Summit No. 27296, 2015-Ohio-402, the defendant was convicted of both procuring prostitution, in violation of R.C. 2907.23(A)(2), and promoting prostitution, in violation of R.C. 2907.22(A)(2). Regarding the charge of procuring prostitution, the Ninth District Court of Appeals found that there was sufficient evidence to support the defendant's conviction for that count because "Mr. Marcel–Rene forwarded the telephone numbers of multiple men to E.C. [the prostitute] so that they could engage in sexual activity for hire." *Id.* at ¶ 10.

{¶ 37} With respect to the promoting prostitution charge, the Ninth District found the following:

[T]here was evidence that Mr. Marcel–Rene assisted E.C. with her internet postings, that he helped to arrange dates for her, that he transported her to dates and waited outside until she was finished, and that he received a fee from E.C. after each date. This evidence is sufficient to establish that Mr. Marcel–Rene supervised or managed the activities of a prostitute under Section 2907.22(A)(2).

*Id*. at ¶ 10.

{¶ 38} Upon review, we agree with the reasoning of the *Marcel-Rene* court and find the conduct prohibited by R.C. 2907.22(A)(2) and R.C. 2907.23(A)(1) to be separate and distinct. The statutes are not in conflict with one another. Specifically, the misdemeanor offense of procuring prostitution prohibits an individual from essentially acting as an intermediary between a prostitute and her client, similar to the defendant in *Marcel-Rene* who merely forwarded the telephone numbers of clients to a prostitute so that they could independently connect with one another and engage in sexual activity for hire. *Id*. at ¶ 10. Other than informing the potential client or prostitute of the availability of a sex for hire opportunity, the defendant guilty of procuring prostitution has no further involvement in the transaction, and certainly no supervision or management of the activities of the prostitute.

{¶ 39} In the instant case, evidence was adduced which established that Jennifer created the Backpage advertisements and posted the photographs of Angel wherein she offered to engage in sex for hire. Jennifer used her phone number as the contact number in the advertisements. When an individual called her phone number, Jennifer arranged the "date" for Angel, negotiating the price, location, duration, and time that the

"date" was to occur. Furthermore, Jennifer arranged transportation to and from the "date" for Angel. Jennifer also rode with Angel to the "date" and waited in the vehicle while it was occurring. Finally, Jennifer expected to receive a share of the profits after the "date" was completed. Jennifer was not simply providing Det. Howard's contact information to Angel for her to independently pursue. Rather, the evidence adduced by the State establishes that Jennifer promoted prostitution, in violation of R.C. 2907.22(A)(2), by supervising or managing the conduct of Angel when she attended her "date" with Det. Howard. *Id.* Therefore, the trial court did not err, plainly or otherwise, when it found her guilty of promoting prostitution, rather than procuring prostitution.

{¶ 40} Jennifer's second and final assignment of error is overruled.

{¶ 41} Both of Jennifer's assignments of error having been overruled, the judgment of the trial court is affirmed.

. . . . . . . . . . . . .

FROELICH, J. and TUCKER, J., concur.

Copies mailed to:

Heather N. Jans
Adelina E. Hamilton
Hon. Dennis J. Langer