# IN THE COURT OF APPEALS OF OHIO

SEVENTH APPELLATE DISTRICT
COLUMBIANA COUNTY

STATE OF OHIO,

Plaintiff-Appellee,

v.

SHANIKA S. SIMMONS,

Defendant-Appellant.

---

**OPINION AND JUDGMENT ENTRY**
**Case No. 25 CO 0015**

---

Criminal Appeal from the
Court of Common Pleas of Columbiana County, Ohio
Case No. 2022-CR-504

**BEFORE:**
Carol Ann Robb, Cheryl L. Waite, Mark A. Hanni, Judges.

---

**JUDGMENT:**
Affirmed.

---

*Atty. Vito J. Abruzzino,* Prosecuting Attorney*, Atty. Christopher R. W. Weeda,* Assistant Prosecuting Attorney, for Plaintiff-Appellee and

*Atty. Edward A. Czopur*, for Defendant-Appellant.

Dated:  February 4, 2026

**Robb, J.**

{¶1} Defendant-Appellant Shanika S. Simmons appeals her conviction of promoting prostitution after a jury trial in the Columbiana County Common Pleas Court. Where the state alleged she offered the sexual services of herself and another female to an undercover officer, Appellant contends she received ineffective assistance of counsel when her attorney failed to subpoena the other female. Appellant then argues the state failed to present sufficient evidence on the elements related to the operation of an enterprise. She also claims the verdict was contrary to the manifest weight of the evidence. For the following reasons, Appellant's conviction is upheld, and the trial court's judgment is affirmed.

STATEMENT OF THE CASE

{¶2} Appellant was arrested in East Palestine on August 2, 2022 during an undercover police operation. The September 14, 2022 indictment charged Appellant with a single count of promoting prostitution in violation of R.C. 2907.22(A)(1), a fourth-degree felony. She was appointed counsel, signed a speedy trial waiver, hired private counsel, failed to appear at a hearing, hired a second private attorney, unsuccessfully tried to terminate that attorney, failed to appear for another hearing, and was returned to the court almost a year later. The jury trial finally proceeded on July 29, 2024.

{¶3} The state presented the testimony of a police detective, who was also a member of the Mahoning Valley Human Trafficking Task Force and was trained in undercover internet investigations used to conduct demand reduction operations. (Tr. 157-162). He viewed a website called skipthegames.com, which he described as almost exclusively a prostitution website. (Tr. 163). Upon searching for a female in the general Youngstown area, he found an advertisement titled, "If your [*sic*] looking for some fun tonight!"

{¶4} Under this title was a photograph of Appellant, whom he was able to identify. (Tr. 169); (St.Ex. 1). A second photograph showed the back bottom portion of a clothed body. Appellant's age was listed as 38 and her "grooming down under" as shaved while promoting she was available "24/7" for "Outcall" (travel to the client who provides the

location).  The next section added "Incall" (client travels to the provider) within the following declaration:

> Hi My name is Nikki. Available for Outcall and Incall. I'm located in Struthers ohio location. Call me if your [*sic*] looking for fun unrushed time. [I]f you never experienced a black woman call me. Call me anytime day or night. If you're looking for some chocolate stop by!
>
> Activities this service provider may enjoy
>
> Deep throat . . . Girlfriend experience . . .  Intercourse - Oral . . . Intercourse - Vaginal . . . Pornstar experience . . ."

(St.Ex. 1) (also including less incriminating activities such as sensual or therapeutic massage and lunch or dinner dates).

**{¶5}**  According to the detective, the website prepopulates a list of 32 "[a]ctivities this service provider may enjoy," and the above-quoted activities remained after the person constructing the ad removed over half the choices.  (Tr. 171).  The ad ended with a disclaimer stating, "Any fees or compensation paid to me are for my time and companionship only . . .  I do not engage in any unlawful acts." *Id.*

**{¶6}**  In order to respond to Appellant's advertisement, the detective clicked the "Call me" button and then texted the phone number that appeared after he was prompted to entered a captcha.  (Tr. 173).  For his communications during this investigation, the detective used an undercover law enforcement system to which the department subscribed (LETS).  He explained this system assigns to the investigator a new phone number on which all text messages and phone calls are automatically saved to the system provider's cloud, which cannot be altered.  (Tr. 164-165, 172-173).

**{¶7}**  The detective identified and reviewed the texts between this phone number issued to him and the ad's phone number, which were provided verbatim for the jury's review as well.  (St.Ex. 2).  In the detective's first set of texts on July 29, 2022, he asked for an outcall and said he was 30 minutes from Struthers but would pay extra because he could not drive his work truck to Appellant's advertised location.

**{¶8}**  There was no response until August 2, 2022 when Appellant texted the detective and announced, "What's up it's Nikki from Struthers I'm available now I save ha [sic] a friend with me."  (St.Ex. 2).  She sent him a photograph of herself.  (St.Ex. 3).  She

also sent him a photograph of her friend.  (St.Ex. 4).  This friend was identified by the detective as C.R.  (Tr. 177).

{¶9}   The detective's reply asked, ". . . how much for both . . . One hour."  He texted about living in a house in East Palestine and described himself as a respectful, clean, and disease-free fifty-year-old man.  In addition, he inquired, "Any rules?"  A subsequent response from Appellant said, "No back door and no rough housing."  (St.Ex. 2).

{¶10}  Appellant then asked, "Do you want us to come to you?"  The detective answered in the affirmative and reiterated his claim that he was unable to drive his work vehicle due to its GPS tracking.  Appellant requested a deposit of $25 stating "we" need gas money.  She provided a Cash App user name for the payment.  The detective initially expressed hesitation about providing a deposit, claiming he lost a similar deposit last week.  He promised to provide gas money when she arrived.  Appellant replied, "I'm not going to burn you hun I really need gas in my tank to make it to you."  They eventually agreed to a payment of $10 for the gas to be paid through Cash App.  *Id.*

{¶11}  Appellant called the detective, and this recorded call was played at trial. (St.Ex. 5).  In the call, she disclosed there were sting operations in East Palestine "so like don't no girls wanna go out there."  She explained her reasoning in seeking the deposit was based on her belief the police were unable to send money.

{¶12}  In addition, she said she would not go to East Palestine for less than $150 or $200.  She asked if he wanted one or both of them, and he said both.  She said she charged $150 for a half hour and so did her friend "so that's be like $300 for half an hour" and then subtracted the $10 deposit.  When the detective said he preferred an hour and asked if $450 would be enough, Appellant responded, "Yeah, I could – we could do that." *Id.*

{¶13}  Appellant indicated they wanted to see what he looked like and asked if he could "shave down there."  The detective sent a photograph, and Appellant texted, "Your handsome . . . We like what we see."  Appellant set the meeting time for 2:00 p.m. "cause we're taking showers now."  When the detective informed Appellant he sent the $10 for gas, she replied, "We got it."  She also noted, "What kind of money you're paying we ain't standing you up."  (St.Ex. 2).

**{¶14}** The detective asked if he needed "raincoats" (which he testified meant condoms), but Appellant said she had them. (Tr. 186). After Appellant viewed a photograph of the detective's address on Google maps, they engaged in a discussion about the junk cars in front of the house. (Tr. 191-192). She told him the model of her vehicle. (Tr. 191). The detective testified he only spoke to Appellant and never spoke to C.R. on the phone. (Tr. 189).

**{¶15}** Appellant moved the meeting time back while explaining, "I had to go get her some cigarettes and we stopped at the gas station." Other updates said, "We're coming . . . Sorry we both had to take showers." These were immediately followed by a request for the detective to call or text a different number that was provided in the text. The detective texted the second number and received no response.

**{¶16}** When Appellant arrived at the decoy house at the end of a dead-end street, the police were waiting. (Tr. 193, 198). The detective identified Appellant as the driver and the person in the online ad; he identified her passenger as C.R. (Tr. 169, 194). Appellant had condoms and two phones with her. (Tr. 195). One of Appellant's phones had a SIM card matching the second phone number texted to the detective at the end of the conversation. (Tr. 193); (St.Ex. 11). The original phone number provided by Appellant's advertisement and used for the conversation was connected to a free texting application. (Tr. 192).

**{¶17}** The detective did not perform an extraction of data from Appellant's phones because he already had Appellant's ad, his own verbatim log of the texts between his phone number and the number provided by Appellant's ad, and the recording of the phone call she made to the detective from the same number. Moreover, C.R. gave consent for a data extraction search of her phone, during which the detective found no communications arranging sexual activity. (Tr. 207).

**{¶18}** The detective testified he was unable to locate C.R. in preparing for the case. He noted there was an active warrant for her arrest in Mahoning County for drug possession and a probation violation. (Tr. 197-198). The state then rested, and the defense moved for acquittal under Civ.R. 29(A).

**{¶19}** Appellant testified in her own defense. She said she usually performed massages but "at the time, I was on drugs, so I did do happy endings." (Tr. 231, 234).

Case No. 25 CO 0015

She described her advertisement on skipthegames.com as a massage ad. She believed the printouts of the ad and the texts submitted as trial exhibits were different than the ad she posted online or the texts she sent to the detective. (Tr. 235). We note the texts from Appellant ended with the closing phrase, "~Thanks for texting me~" (as if the texting application she used was set to use this closing phrase for each text). (St.Ex. 2).

{¶20} As to the content of the ad, she said, "I'm not- - I'm just saying I never created an ad where I say those things in the subject line . . . The wording in that ad is not something that I have ever had in my ads . . . When I say chocolate and all that, no . . . I don't talk - - I have never said any of that in my ad." (Tr. 238-239). She also seemingly took issue with the format of the printout by stating, "This is not how the ads are on that site, that's not how they go . . . that's not how they're positioned . . . that's not how the ads are constructed . . . that's not how the ad go, sir." (Tr. 237-238).

{¶21} Nevertheless, she agreed: the detective responded to an advertisement she created; she was the one who raised the topic of bringing a friend; and she sent the photograph of C.R. without being asked to do so by the detective. (Tr. 244). She admitted she was soliciting the detective and agreed she was "prostituting herself." (Tr. 231, 246, 250).

{¶22} When asked about the call played in court wherein she negotiated the price with the detective and agreed to accept $450 for the services of both her and C.R., she said C.R. was listening on speakerphone. (Tr. 241). Appellant testified she first met C.R. at a drug house, and then, a "couple days" before the conduct at issue in this case, she let C.R. stay at her residence because C.R. was "walking the streets" and homeless. (Tr. 231).

{¶23} Appellant explained, "And I was doing my calls or whatever, and she was with me, and that's how I asked if she wanted to go . . . We went and got drugs before we went . . . she was present for the calls when I said 150, you get 150, on everything, she knew everything." (Tr. 231-232). Appellant further testified, "[C.R.] said yes. She was aware. I told her I was getting the picture. I sent it – sent it to them. Said, yes, everything - - she was okay with. Never once did I run a business. I was just on drugs." (Tr. 233).

{¶24} According to Appellant's theory, she was not soliciting C.R. because C.R. said yes when asked if she wanted to go. Appellant reasoned, "I was soliciting myself,

and she was coming along with me making her own money." (Tr. 249). Appellant asserted she never managed, supervised, controlled, or had an interest in C.R.'s sexual activity for hire, she never made money off C.R. performing sexual activity, and she did not intend to receive a portion of C.R.'s share of the price negotiated with the detective. (Tr. 232-233, 248, 250). In closing, the defense argued if Appellant were involved in a business enterprise, then she would have expected to make money off C.R.'s involvement.

{¶25} The jury found Appellant guilty as charged. Appellant filed various post-trial motions, and there were various delays in sentencing.

{¶26} On August 12, 2024, she filed a post-verdict motion for acquittal under Crim.R. 29(C). The court denied this motion. (10/8/24 J.E.).

{¶27} On October 3, 2024, she filed a motion for a new trial alleging newly discovered evidence. She attached a September 18, 2024 affidavit from C.R. In the affidavit, C.R. said Appellant did not try to "make her" engage in sexual acts with men. C.R. also disputed certain statements attributed to her in a police report, which was not presented as evidence at trial.

{¶28} The court denied the new trial motion, finding it unreasonable to believe Appellant was unaware of C.R.'s potential testimony and pointing out she was not prevented from discovering it before trial. The court noted Appellant was free on bond at the time of her trial, which was held almost two years after the offense. It was also pointed out there was no evidence on the efforts to locate C.R. for trial. (4/11/25 J.E.).

{¶29} On the same day the new trial motion was filed, Appellant failed to appear for sentencing. She thereafter demanded the withdrawal of retained counsel and received appointed counsel for the rescheduled sentencing hearing (whom she then unsuccessfully sought to terminate as well). (11/5/24 Mot.); (11/8/24 J.E); (11/29/24 J.E.); (4/30/25 Tr. 3). Further delaying the case, transportation and coordination issues arose between different jail facilities.

{¶30} Finally, sentencing proceeded, and Appellant was sentenced to 12 months in prison. (5/27/25 J.E.). She thereafter filed a timely notice of appeal.

<u>ASSIGNMENT OF ERROR ONE</u>

{¶31} Appellant sets forth three assignments of error, the first of which provides:

<u>Case No. 25 CO 0015</u>

"Appellant was denied her right to the effective assistance of counsel, pursuant to the Sixth Amendment to the United States Constitution, when trial counsel failed to subpoena a key witness, [C.R.]."

{¶32} A claim of ineffective assistance of counsel requires a showing of both deficient performance and resulting prejudice. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Consequently, if the performance was not deficient, then there is no need to review for prejudice and vice versa. *State v. Madrigal*, 87 Ohio St.3d 378, 389 (2000). Moreover, in the direct appeal of the criminal conviction, these items must be demonstrated by the record before the court, as opposed to being based on speculation or proof outside the record. *State v. Hartman*, 93 Ohio St.3d 274, 299 (2001).

{¶33} In evaluating an alleged deficiency in performance, the court asks whether there was "a substantial violation of any of defense counsel's essential duties to his client" so that "counsel's representation fell below an objective standard of reasonableness." *State v. Bradley*, 42 Ohio St.3d 136, 141-142 (1989), citing *Strickland* at 687-688. Our review is highly deferential to counsel's decisions as there are "countless ways to provide effective assistance in any given case" and there are strong presumptions that the decisions fell within the wide range of reasonable professional assistance. *Id.* at 142, citing *Strickland* at 689. We refrain from second-guessing the strategic decisions of counsel. *State v. Carter*, 72 Ohio St.3d 545, 558 (1995).

{¶34} On the prejudice prong, an appellant must show there is a reasonable probability the result of the proceedings would have been different but for the serious errors committed by counsel. *Id.* at 557-558. Prejudice from defective representation justifies reversal only where the results were unreliable or the proceeding was fundamentally unfair due to the performance of trial counsel. *Id.*, citing *Lockhart v. Fretwell*, 506 U.S. 364, 369 (1993). Lesser tests of prejudice have been rejected: "It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." *Bradley* at 142, fn. 1, quoting *Strickland* at 693.

{¶35} Appellant concludes her trial counsel should have subpoenaed C.R. or made an effort to do so, arguing this would have opened a path to seeking a material witness warrant or obtaining a continuance in order to search for C.R. Appellant says C.R. would have been a key witness because she may have testified Appellant had no

monetary interest in offering C.R.'s prostitution services to clients. As discussed further in subsequent assignments of error on sufficiency and weight, Appellant urges that if she only had an interest in prostituting herself and a friend came along who had her own interest in prostituting herself, then Appellant would not have been found guilty of promoting prostitution despite her active involvement in the advertising, communication, personal solicitation, negotiation, and transportation.

{¶36} Appellant quotes, "In order to obtain a reversal on ineffective assistance of counsel based on a failure to subpoena a witness, a defendant must demonstrate that the testimony of the witness would be of significant assistance to the defense." *Cleveland v. Graham*, 2014-Ohio-3413, ¶ 11 (8th Dist.). Still, in general, "counsel's decision whether to call a witness falls within the rubric of trial strategy and will not be second-guessed by a reviewing court." *State v. Treesh*, 90 Ohio St.3d 460, 490 (2001). As further pointed out by the Ohio Supreme Court, "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *State v. Williams*, 2003-Ohio-4396, ¶ 125, quoting *Strickland* at 690. And, this court has observed, "failure to subpoena witnesses is not prejudicial if the testimony of those witnesses simply would have been corroborative." *State v. Gettings*, 2017-Ohio-7764, ¶ 21 (7th Dist.).

{¶37} Appellant states the importance of C.R. to her defense was known prior to trial, as she was the other prostitute who arrived with Appellant to provide services to the client after Appellant negotiated a price for herself and C.R. Appellant also points to her motion for new trial made before sentencing and the affidavit of C.R. attached in support of the motion, which Appellant says contains information that would have helped contradict the state's theory of the case at trial.

{¶38} Certain attestations in C.R.'s affidavit merely contradicted statements attributed to her in a police report; these were statements she made to the police just after she and Appellant arrived for their appointment in East Palestine. For instance, C.R.'s affidavit claims the following statements were not true: Appellant offered her a place to stay because she was homeless while Appellant was telling her a guy wanted to do something for money and Appellant would do most of the work; on another occasion, Appellant asked her to perform sexual acts with two men; she did not want to go with Appellant to the East Palestine appointment but ended up agreeing; and she asked

Appellant to drop her off during the drive to East Palestine. However, the police report was not evidence at trial. In other words, as these allegedly untrue hearsay statements were not presented by the state at trial, C.R.'s refutation of them would not have materially aided the defense.

{¶39} C.R.'s post-trial affidavit also stated, "Shanika Simmons brought it to my attention that the officer was saying [Appellant] was trying to make [C.R.] do sexual things with men. That is not true, it was a massage and there were 3 audio calls." As to the first statement in this quote, we point out the case did not revolve around compelled prostitution, as discussed further in a subsequent assignment of error.

{¶40} Concerning the second statement, it was at odds with the defense, and C.R.'s personal intent was not dispositive of Appellant's criminal liability for the arrangement she made with the detective. The offer, acceptance, and negotiation between Appellant and the detective made it clear he would be paying for more than a massage, and Appellant's defense acknowledged her solicitation of the detective.

{¶41} Regarding the last part of the quote on the subject of an additional call, Appellant had previously argued to the trial court that the state failed to produce a third call with the detective; she claimed C.R. spoke during that call. In addressing this discovery issue, the trial court adopted the state's attestation that there was no third call.

{¶42} As the state points out, defense counsel may have tactically decided C.R.'s testimony would not have been helpful to the defense strategy, part of which involved an acknowledgement Appellant was soliciting or prostituting herself. The allegedly new evidence from C.R. would not have eliminated the contents of the Appellant's solo online advertisement, the texts from Appellant, or the content of the recorded phone call played at trial. As the trial court pointed out, the affidavit did not qualify as newly discovered evidence under Crim.R. 33(A)(6). In any event, Appellant utilizes it on appeal in an attempt to demonstrate trial counsel's ineffectiveness before or at trial.

{¶43} Notably, C.R. was in fact subpoenaed for trial but could not be located by the deputy sheriff attempting to serve her. The testifying police detective also said he could not locate her in preparation of the case for trial. In addition, he explained C.R. had an active warrant for her arrest in Mahoning County at the time of trial. We note this was two years after Appellant's arrest due to continual delays prompted by her conduct. As

pointed out by the trial court in denying her new trial motion, Appellant was released on bail pending trial and did not demonstrate independent efforts to locate the witness were made prior to trial. For all we know, the defense was relieved the state could not locate C.R. due to a belief any truthful testimony would be unfavorable or a belief any favorable testimony would be viewed as lacking in credibility.

**{¶44}** A post-trial shift in strategy and Appellant being able to obtain an affidavit from C.R. seven weeks after trial does not negate the reasonableness of the prior strategy. There is no indication counsel failed to investigate C.R.'s potential assistance or that C.R. would have been located or detained if the defense had issued a subpoena after the state's attempt failed. As the Supreme Court emphasizes, it is within counsel's professional judgment to make decisions about the evidence to present even if counsel "disobeyed [the defendant's] instructions to call [a certain] witness . . ." *Williams*, 2003-Ohio-4396, at ¶ 126-127. In sum, the record does not establish deficient performance or prejudice in failing to issue a separate defense subpoena for C.R. Consequently, this assignment of error is overruled.

ASSIGNMENT OF ERROR TWO

**{¶45}** Appellant's second assignment of error contends:

"The conviction in this matter was based on insufficient evidence as the state failed to prove that Appellant was operating an 'enterprise.'"

**{¶46}** Whether the evidence is legally sufficient to sustain a conviction is a question of law dealing with adequacy. *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997). Our sufficiency review after trial uses the same standard as applicable to a defendant's motion for acquittal made to the trial court. *See State v. Williams*, 74 Ohio St.3d 569, 576 (1996); Crim.R. 29(A),(C). An evaluation of witness credibility is not involved in a sufficiency review, as the question is whether the evidence is sufficient if it is believed. *State v. Yarbrough*, 2002-Ohio-2126, ¶ 79, 82; *State v. Murphy*, 91 Ohio St.3d 516, 543 (2001). Accordingly, sufficiency involves the state's burden of production rather than its burden of persuasion. *Thompkins* at 390 (Cook, J., concurring).

**{¶47}** In reviewing the sufficiency of the evidence, the court views the evidence in the light most favorable to the prosecution to ascertain whether some rational juror could have found the elements of the offense proven beyond a reasonable doubt. *State v. Goff*,

82 Ohio St.3d 123, 138 (1998). The evidence on the elements to be reviewed includes all reasonable inferences. *See id.*; *see also State v. Filiaggi*, 86 Ohio St.3d 230, 247 (1999) (viewing reasonable inferences in favor of the state); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (consider all evidence in the light most favorable to the prosecution, including reasonable inferences). Circumstantial evidence inherently possesses the same probative value as direct evidence. *Treesh*, 90 Ohio St.3d at 485.

**{¶48}** The elements of the promoting prostitution offense for which Appellant was convicted are as follows: "knowingly . . . Establish, maintain, operate, manage, supervise, control, or have an interest in a brothel or any other enterprise a purpose of which is to facilitate engagement in sexual activity for hire." R.C. 2907.22(A)(1). Sexual activity includes both sexual conduct and sexual contact. R.C. 2901.01(C). "A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature." R.C. 2901.22(B) (and has knowledge of circumstances if she was aware such circumstances probably exist).

**{¶49}** Appellant contends there was no evidence she established, maintained, operated, managed, supervised, controlled, or had an interest in an enterprise. In other words, although the evidence may have adequately showed she individually had a purpose to facilitate engagement in sexual activity for hire, she suggests the evidence did not adequately show this was through some enterprise she had an interest in or established.

**{¶50}** In a Ninth District case cited by Appellant, a detective responded to the juvenile-appellant's backpage.com advertisement promoting a "two girl special" and displaying a photograph of another juvenile who later traveled with the juvenile-appellant to a hotel to engage in sexual activity for hire. *In re T.J.*, 2014-Ohio-4919, ¶ 26-27 (9th Dist.). When the two juveniles arrived, the undercover officer solidified the previously-negotiated price and then initiated the arrest. *Id.* at ¶ 2, 23. The juvenile-appellant admitted they planned to split the money (after paying a driver); she also admitted she maintained the ad where she always used the same name but changed the photograph depending who was available. *Id.* at ¶ 25, 27. The appellate court found sufficient

evidence to adjudicate her delinquent for promoting prostitution under R.C. 2907.22(A)(1). *Id.* at ¶¶ 19-22, 27-28.

**{¶51}** Appellant argues her case is distinguishable because the juvenile-appellant in *T.J.* essentially acknowledged previous conduct of coordinating sexual activity for hire. Nonetheless, the Ninth District's ruling focused on the juvenile-appellant's actions related to her arrival at the hotel to provide sexual activity for hire with another girl after promoting their joint services online in an advertisement maintained by the juvenile-appellant. *See id.* Notably, the court had no issue with the splitting of the fee so that the juvenile-appellant did not make more than the other juvenile-prostitute whose services she promoted. *See id.*

**{¶52}** Appellant also cites an Ohio Supreme Court case discussing an enterprise as including an individual, a sole proprietorship, a partnership, and an association in fact. *State v. Beverly*, 2015-Ohio-219, ¶ 3, 8 (plus corporations and other legal entities). She moves straight to the "association in fact" option by pointing out the Court defined it as a group of people associated together for a common purpose of engaging in a "course of conduct." *Id.* at ¶ 9 (observing this "de facto enterprise" often becomes relevant when evaluating a purely illicit enterprise). Appellant then focuses on the term course of conduct. She says in a sentencing context, a course of conduct involves more than one offense. From this, she concludes there must be proof of more than one incident to establish an enterprise, claiming a singular incident is not sufficient.

**{¶53}** Initially, we point out Appellant's argument ignores the fact that she ran an advertisement offering intercourse, but then responded to a text inquiring about her *services by adding an offer for the simultaneous services of a second prostitute*, negotiated the price for the two prostitutes, and drove the other prostitute to the client.

**{¶54}** Next, we observe the Supreme Court sentencing case she cites was specifically addressing a death penalty specification that asked whether a "single course of conduct" involved the purposeful killing of or attempt to kill "two or more" people. *State v. Sapp*, 2004-Ohio-7008, ¶ 51-56 ("when two or more offenses are alleged to constitute a course of conduct under [the cited statute]"). The analysis of the connection or pattern related to the two offenses was part of the statutory test for the specification, not a general holding. *Id.* (where the defendant argued the offenses were different courses of conduct,

not the same course of conduct). That is, the *Sapp* case did not hold that every time "course of conduct" is used in a definition it requires two offenses to be charged or proven.

**{¶55}** Moreover, the *Beverly* case Appellant uses to commence the construction of her argument has various distinguishing features. The Supreme Court analyzed the distinct offense of "engaging in a pattern of corrupt activity" and employed a statutory definition of enterprise provided by the legislature for that specific offense. *Beverly* at ¶ 3, 10 (concluding although one element does not necessarily prove the other, the enterprise element and the pattern element could be established by the same evidence); R.C. 2923.32(A) (engaging in a pattern of corrupt activity); R.C. 2923.31(A) (definitions for R.C. 2923.31-.36), (C) (enterprise), (E) (defining pattern of corrupt activity), (E)(1)(e) (defining corrupt activity as including promoting prostitution under R.C. 2907.22).

**{¶56}** Appellant was not charged with engaging in a pattern of corrupt activity, which is a higher degree of offense (a second-degree felony at the minimum). *See* R.C. 2923.32(B)(1). The "pattern of corrupt activity" required under Ohio's Racketeering Influenced and Corrupt Organizations Act (RICO) was not a required element for promoting prostitution. *Compare* R.C. 2907.22(A)(1) (the promoting prostitution offense at issue) *with* R.C. 2923.32(A) (part of the RICO act).

**{¶57}** Likewise, in response to Appellant's emphasis that she did not compel or control her friend, we note Appellant was not charged with supervising, managing, or controlling the activities of a person engaging in sexual activity for hire under the second promoting prostitution subdivision. *See* R.C. 2907.22(A)(2),(C) (the same fourth-degree level of felony).[1] Nor was she charged with compelling prostitution or trafficking in persons. *See* R.C. 2907.21(A)(1) ("knowingly . . . Compel another to engage in sexual activity for hire"), (C) (third-degree felony); R.C. 2905.32(A)(1) ("knowingly recruit, lure, entice, isolate, harbor, transport, provide, obtain, or maintain . . . another person if . . .

---

[1] In addition to being charged with promoting prostitution under (A)(1), her initial charges after arrest included an additional promoting prostitution charge under a different subdivision of the same statute, which states: "No person shall knowingly . . . Transport another, or cause another to be transported, in order to facilitate the other person's engaging in sexual activity for hire." R.C. 2907.22(A)(3),(B) (also a fourth-degree felony). However, the municipal court complaint for promoting prostitution under (A)(3) included the phrase "transport across state lines" in the title of the offense, and Appellant was thereafter indicted only for promoting prostitution under (A)(1).

The offender knows that the other person will be . . . compelled to engage in sexual activity for hire"), (E) (first-degree felony).

**{¶58}** Even assuming the statutory definition of enterprise discussed in *Beverly* would generally apply to other offenses, the definition included more options than an association in fact (with the association in fact being defined as a group of people associated together for a common purpose of engaging in a course of conduct). *Beverly*, 2015-Ohio-219, ¶ 8-9. As stated above, the Court discussed the definition of enterprise as also including an individual, a sole proprietorship, and a partnership. *Id.* at ¶ 8. It has been explained: "As the definition of "enterprise" in R.C. 2923.31(C) includes any individual or sole proprietorship, evidence of such activities on [the defendant's] part alone served to prove his association with an enterprise consisting of himself as the sole proprietor." *State v. Smith*, 2025-Ohio-2939, ¶ 24 (3d Dist.).

**{¶59}** It has also been observed, "prostitution is by definition a business enterprise, albeit an illegal one." *State v. Satterfield*, 2017-Ohio-5616, ¶ 26 (2d Dist.). Furthermore, the Third District in *Smith* alternatively found evidence of "an association-in-fact enterprise, however loosely organized" due to the defendant's texts with his girlfriend showing her active support in his business. *Smith* at ¶ 25.

**{¶60}** Here, Appellant's photograph was on skipthegames.com in an advertisement calling herself Nikki (where her legal name is Shanika). This ad listed multiple sexual activities with an invitation to call in order to experience her and have fun "tonight" stating she was available 24/7 for outcall. Some of the activities listed were "Deep throat . . . Girlfriend experience . . . Intercourse - Oral . . . Intercourse - Vaginal . . . [and] Pornstar experience . . ." (St.Ex. 1). According to the detective, when constructing an ad on this website, a longer list of activities is prepopulated; however, half of the activities had been eliminated from Appellant's list. This demonstrated a conscious effort to confirm the sexual activities being advertised, rather than an accidental listing of every item on a prepopulated list.

**{¶61}** Appellant ignored the detective's initial inquiry to her ad. In that inquiry, the detective did not mention a second prostitute. Three days later, Appellant initiated contact with the detective by texting him to say she was immediately available while specifying

she had a friend with her. Before he could respond, Appellant texted him a photograph of herself and a photograph of her friend.

{¶62} In addition to texting the detective, Appellant called him on the phone. She voiced her knowledge of prior sting operations in the location of the outcall (East Palestine) and nearby towns. She disclosed that because of those operations, "don't no girls wanna go out there." Appellant made the plans, negotiated a deposit for gas money, ensured he wanted both females, announced the price of $150 each for half an hour for a total of $300, and then accepted the detective's offer of $450 for both for one hour. She also provided a Cash App user name for the deposit so she could put gas in her vehicle and gave rules ("no back door and no rough housing"). She asked the detective to shave his private area and requested his photograph. She said okay when he said he would like a weekly appointment if "we all got along."

{¶63} In explaining a delay to the detective, Appellant disclosed they both showered. She also said, "I had to go get her some cigarettes" and "I put the 10 in the tank." In the last text, the detective was asked to call or text a different number, which belonged to one of the two cell phones Appellant brought with her to East Palestine. In addition, Appellant brought condoms with her, which she had agreed to provide during the phone call. Further, the detective testified he only spoke with Appellant in arranging the services of the two females. When they arrived at the destination in East Palestine, Appellant was the driver with her friend as the passenger.

{¶64} Appellant claims there is no evidence she would have received more money from the transaction than her friend would have received. However, this would not negate the elements surrounding an enterprise, which involve, among other acts, the establishment, operation, or interest *in the enterprise* (that has a purpose to facilitate sexual activity for hire), rather than an interest in the amount claimed to be relevant to one prostitute.

{¶65} In any event, a reasonable inference could be made that Appellant had an interest in this advertised business enterprise where she was the prostitute in the solo online advertisement (that enticed the client's initial response), who took charge of communications with the client, was the only negotiator of the price and terms, and drove herself and the other prostitute to the client (among other facts recited above). In addition,

the jury viewed the friend's photograph Appellant sent to the detective as added enticement after she failed to respond for three days to his initial inquiry. Without this friend, Appellant may not have been able to obtain certain clients for the rate quoted (for her alleged half). For a sufficiency review, the question is merely whether "any" rational trier of fact could have found the contested element satisfied beyond a reasonable doubt. *State v. Getsy*, 84 Ohio St.3d 180, 193 (1998), quoting *Jackson*, 443 U.S. at 319.

**{¶66}** Again, reasonable inferences are evaluated in the light most favorable to the prosecution, and circumstantial evidence has the same value as direct evidence. *Goff*, 82 Ohio St.3d at 138; *Filiaggi*, 86 Ohio St.3d at 247; *Jackson*, 443 U.S. at 319; *Treesh*, 90 Ohio St.3d at 485. A rational juror could conclude beyond a reasonable doubt that Appellant knowingly established, maintained, operated, managed, supervised, controlled, or had an interest in an enterprise for the purpose of which was to facilitate engagement in sexual activity for hire. As there was sufficient evidence of promoting prostitution in violation of R.C. 2907.22(A)(1), this assignment of error is overruled.

## ASSIGNMENT OF ERROR THREE

**{¶67}** Appellant's third assignment of error alleges:

"The conviction in this matter was against the manifest weight of the evidence."

**{¶68}** Weight of the evidence concerns the effect of the evidence in inducing belief, and our corresponding review evaluates "the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other." *Thompkins*, 78 Ohio St.3d at 387. The appellate court considers whether the state met its burden of persuasion. *Id.* at 390 (Cook, J., concurring) (as opposed to the state's burden of production involved in a sufficiency review).

**{¶69}** When a defendant argues a conviction is contrary to the manifest weight of the evidence, the appellate court reviews the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses, and determines whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *State v. Lang*, 2011-Ohio-4215, ¶ 220, citing *Thompkins* at 387. "[T]he weight to be given the evidence and the credibility of the witnesses are primarily for the trier of

the facts." *State v. Hunter*, 2011-Ohio-6524, ¶ 118, quoting *State v. DeHass*, 10 Ohio St.2d 230 (1967), paragraph one of the syllabus.

**{¶70}** The trier of fact occupies the best position from which to weigh the evidence and judge the witnesses' credibility by observing their gestures, voice inflections, and demeanor. *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984). "We therefore generally proceed under the premise that when there are two fairly reasonable views of the evidence or two conflicting versions of events, neither of which is unbelievable, we do not choose which one we believe is more credible." *State v. Carter*, 2017-Ohio-7501, ¶ 105 (7th Dist.), citing *State v. Gore*, 131 Ohio App.3d 197, 201 (7th Dist. 1999).

**{¶71}** Additionally, where a case was tried by a jury, only a unanimous appellate court can reverse on manifest weight of the evidence grounds. Ohio Const., art. IV, § 3(B)(3). The power of the court of appeals to sit as the "thirteenth juror" is limited in order to preserve the jury's primary function of weighing the evidence. *Thompkins* at 389.

**{¶72}** In analyzing the weight of the evidence, we incorporate our Statement of the Case detailing the testimony and evidence presented at trial and our presentation of the facts and inferences in the prior assignment of error discussing the sufficiency of the evidence on the contested elements. We point out the jury watched the detective testify. They read the texts between him and Appellant. They heard the phone call between Appellant and the detective.

**{¶73}** The jury then witnessed Appellant testify. They were able to listen to her voice inflection and watch her demeanor, eye movements, and gestures, which are all useful in adjudging truthfulness or lack thereof. Her claims about the advertisement printout, her massage business, and her occasional "happy endings" to massages could suggest to them a general lack of credibility. Her statement that she only prostituted herself while she was on drugs and stopped for drugs on the day in question could be weighed toward finding a lack of precise memory on the occurrences at issue.

**{¶74}** Appellant made various claims while testifying that she believed constituted defenses. For instance, she emphasized C.R. freely wished to join her in providing services to the detective and was on speakerphone listening to the phone call. However, as mentioned above, Appellant was not charged with offenses that require control or compulsion of the other prostitute. We also note a person running a prostitution enterprise

Case No. 25 CO 0015

will often supply a joining prostitute with desired substances or housing. Appellant admitted the friend was homeless until a few days before the sting when she let the friend move into her residence. Furthermore, Appellant testified "we" stopped for drugs before the outcall. And, Appellant's text to the detective said she was delayed because she "had to go get" cigarettes for C.R. Circumstantial evidence inherently possesses the same probative value as direct evidence. *Treesh*, 90 Ohio St.3d at 485.

**{¶75}** It was within the jury's province to weigh the testimony and assign value to each statement and each piece of evidence presented at trial. "The jurors are free to believe some, all, or none of each witness'[s] testimony and they may separate the credible parts of the testimony from the incredible parts." *State v. Perkins*, 2025-Ohio-634, ¶ 70 (7th Dist.), citing *State v. Barnhart*, 2010-Ohio-3282, ¶ 42 (7th Dist.), citing *State v. Mastel*, 26 Ohio St.2d 170, 176 (1971). Upon reviewing all testimony and evidence, we conclude this is not the exceptional case where the jury lost its way and created a manifest miscarriage of justice so as to require a new trial on the offense of promoting prostitution under R.C. 2907.22(A)(1). This assignment of error is overruled.

**{¶76}** For the following reasons, Appellant's conviction is upheld, and the trial court's judgment is affirmed.

Waite, P.J., concurs.

Hanni, J., concurs.

_____

For the reasons stated in the Opinion rendered herein, the Appellant's conviction is upheld. It is the final judgment and order of this Court that the judgment of the Court of Common Pleas of Columbiana County, Ohio, is affirmed. Costs waived.

A certified copy of this opinion and judgment entry shall constitute the mandate in this case pursuant to Rule 27 of the Rules of Appellate Procedure. It is ordered that a certified copy be sent by the clerk to the trial court to carry this judgment into execution.

## NOTICE TO COUNSEL

**This document constitutes a final judgment entry.**